INSURANCE CO. OF NORTH AMERICA v. WISCONSIN CENT. RY. CO.

(Circuit Court of Appeals, Seventh Circuit. January 3, 1905.)

No. 1,079.

1. INSURANCE—CANCELLATION OF POLICY—AGENCY.

A representative of plaintiff railroad company, having authority to attend to its insurance business and to do everything in respect thereto that could be done by its officers or directors, gave an order to a broker to place insurance to a stated amount on property of the company at a certain place. The broker applied to an agent at such place having power to issue policies for certain companies, including defendant, and he issued policies in different companies to the required amount, which he forwarded to the broker, who delivered them to plaintiff's representative, by whom they were accepted. Certain of the companies desiring to cancel their policies, the agent wrote others to take their place, and forwarded them to the broker, who presented them to plaintiff's representative, and he accepted the same and surrendered the old ones. Defendant notified its agent to cancel its policies, and he proceeded in the same manner. He noted their cancellation on his books, as also did the broker; but before he had taken the substitute policies to plaintiff's representative the property was destroyed by fire. The policies contained a provision that they might be canceled by defendant on five days' notice to the insured, but no such notice had been given. *Held*, that in the transaction the broker was defendant's subagent, and not an agent of plaintiff; that there was nothing in the course of dealing which gave him implied authority to cancel policies which had been delivered to plaintiff, and substitute others, or to waive notice for plaintiff, but, on the contrary, the course of dealing showed that such power was retained by plaintiff's representative, and that, he having neither consented to the cancellation nor waived notice, defendant's policies remained in force.

[Ed. Note.—For cases in point, see vol. 28, Cent. Dig. Insurance, §§ 99–103, 126–129.]

2. ERROR—REVIEW—DIRECTED VERDICT.

Where, at the conclusion of the trial, both parties move for a directed verdict, the court is thereby authorized to find the ultimate facts, and the only inquiries on review are whether there was any proper evidence to sustain its findings, and whether the law was correctly applied thereto.

3. SAME—WAIVER OF RIGHT TO JURY TRIAL—MOTION FOR DIRECTED VERDICT.

After both parties have moved for a directed verdict, and the court has announced its decision, a party cannot demand the submission of the case to the jury, and assign error upon the court's refusal.

4. PRINCIPAL AND AGENT—DELEGATION OF AUTHORITY BY AGENT.

A person authorized by a corporation to act in its behalf as to all matters pertaining to the insurance of its property, including the fixing of rates and the acceptance and cancellation of policies, cannot delegate his power to another, without the corporation's consent, express or implied.

[Ed. Note.—For cases in point, see vol. 40, Cent. Dig. Principal and Agent, §§ 87–89.]

In Error to the Circuit Court of the United States for the Eastern District of Wisconsin.

George H. Noyes, for plaintiff in error.
M. C. Phillips, for defendant in error.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

BAKER, Circuit Judge. The railroad company brought its action on two policies issued by the insurance company on January

31, 1903, covering property at Menasha, Wis., which was damaged by fire on February 19, 1903.

The parties stipulated the amount the verdict should be, if there was any liability. The defense was that the policies had been canceled by mutual consent of the parties before the fire occurred. At the conclusion of the evidence, which was confined, of course, to the truth of the defense, each party moved the court to direct a verdict in its favor. After the court, in the presence of counsel, had announced the ultimate facts which he found established by the uncontradicted evidence and his conclusion of law thereon that the policies were in force, counsel for the insurance company asked the court to submit to the jury two alleged questions of fact. This the court declined to do, entered the directed verdict, and thereon the judgment now under review.

1. We have read every word of the evidence, and have found no contradictions. The salient and controlling items are these: The home office of the railroad company was at Milwaukee; of the insurance company, at Philadelphia. Gill, at Milwaukee, had full charge of the railroad company's insurance, with authority to agree on rates and forms, to accept and reject policies, to cancel policies after acceptance, and generally to do everything respecting insurance that the company could do through its directors and managing officers. Fieweger, at Menasha, was agent for the insurance company, with authority to write and issue its policies. Leedom, at Milwaukee, was agent of various insurance companies, but not of this one; and he was also an insurance broker—that is, he procured for his customers insurance from other agents, for which business he received from such agents one-half of their commissions. Leedom solicited business from Gill, and had been given some prior to the transaction in question; but the course of dealings between them in other instances was not different from in this. On January 31, 1903, Leedom obtained from Gill an order to place $64,000 insurance on the property at Menasha. Leedom at once transmitted the order to Fieweger, who accepted it. Fieweger wrote up the amount in various companies; canceled some policies and substituted others, entered the transactions in his books, and finally, on February 6, 1903, sent to Leedom 22 policies, aggregating $64,000. Thereupon Leedom entered the policies in his office books, and took them to Gill, who accepted them. Between the 6th and 12th of February Fieweger received instructions from several companies to cancel their policies, whereupon he wrote policies in other companies, entered them in his books, noted in his books that the old ones were canceled, and sent the new to Leedom, with the request that he should take up and return the old. Leedom took the new policies to Gill, who accepted them, and delivered up those for which these were substituted. On February 18th Leedom received a letter from Fieweger, stating that the insurance company had ordered the policies in suit to be canceled, inclosing new policies to be substituted therefor, and requesting the return of the former. Leedom entered the new policies, and noted the cancellation of the old in his office books. On the 19th he tele-

phoned to find whether Gill was in town, and learned that he was absent, but would return on the 20th. Later, on the 19th, the fire at Menasha occurred. On the 20th Leedom tendered the new policies to Gill, who declined to accept them, and refused to surrender the old. Other evidence, and the want of evidence, will be taken up in connection with the contentions of counsel.

Each policy contained this provision: "This policy shall be canceled at any time at the request of the insured, or by the company by giving five days' notice of such cancellation." The five-days time is for the protection of the insured, and therefore can be waived only by the insured or his authorized agent. The insurance company did not give the railroad company notice of cancellation. It merely directed its own agent, Fieweger, who had written the policies, to cancel them. Fieweger did not serve notice upon the insured or upon Gill. If he had, the railroad company or Gill could have waived the five-days provision, and agreed to immediate cancellation. All that Fieweger did was to notify Leedom of the insurance company's instruction to cancel the policies, and to send him others to take their place. So the defense was bottomed on the proposition that Leedom was authorized on behalf of the railroad company to waive notice, to agree to cancellation, and to accept substitute policies.

(a) There was no express authority. Gill's order to Leedom to place insurance, without naming the companies or the rate, meant that Gill was retaining the right to reject any and all policies if the companies or the rates were not satisfactory to him. Leedom testified, without objection, that he never had received any instructions regarding the concellation or substitution of policies for the railroad company, and that he had never exchanged policies without the express direction of Gill. We are excluding Gill's testimony, which was objected to on the ground that it was merely the expression of an opinion, that he had never given Leedom any authority to cancel or substitute policies.

(b) The "course of dealings" between Gill and Leedom did not clothe the latter with implied authority to cancel or substitute. Leedom testified that he frequently solicited Gill for business, sometimes successfully, other times not; that Gill was a customer, like others; and that his dealings with Gill in prior instances did not differ from those in this case. When Leedom received the 22 policies on February 6th, he took them to Gill for his acceptance. Gill accepted them; but, if there had been wildcat companies in the lot, he would have had the right to reject them. When, between the 6th and 12th of February, Fieweger notified Leedom that certain companies had ordered the cancellation of their policies, and inclosed new ones to be substituted, Leedom did not write back to Fieweger that he, on behalf of the railroad company, waived the five-days provision, and agreed to the cancellation and substitution. On the contrary, he went with the new policies to Gill, and told him of the companies' intention to avail themselves of their right of cancellation under the policies, and showed him the new policies which he had ready for his acceptance in case he consented

to waive notice; and thereupon Gill, having satisfied himself respecting the new policies, waived notice, agreed to the cancellation of the old policies, surrendered them, and accepted the new. This course of dealing up to February 18th, so far from establishing an implied authority in Leedom to cancel the policies in suit and substitute others, shows a prohibition of his doing anything of the kind.

(c) A witness from Fieweger's office testified: "It is customary in our office, and customary generally, upon receipt of notice that a company declined a risk, to at once write insurance as a substitute for that which is canceled." Declines the risk? That is, if an agent writes a policy and his company declines the risk before the policy is delivered, the agent writes a policy in some other company and takes it around to his customer for acceptance. If the policy has been accepted by the insured, the company cannot decline the risk, but must cancel.

Leedom testified: "We [speaking for his firm] were to place $64,000 of insurance. It is customary, when we are given an order for insurance for a definite amount, to keep that covered in such companies until we have orders to the contrary." Evidently he was speaking of the usual or customary mode of doing business in his own office. But if he meant a general custom he did not define one that purported to empower brokers "to keep the amount covered" otherwise than in accordance with his course of dealings with Gill.

Leedom further testified: "It is customary, in placing a line with an agent, to ask him to place a certain amount, and if he got cancellations to write them in other companies, and send me new policies, with the request that I get the old ones back. I delivered the new policies to the Wisconsin Central, and received back the old policies for which the new ones were substituted." The comment on his other testimony applies to this as well.

And this was all the evidence touching customs. In our judgment, it did not tend to prove a custom that empowers insurance agents to step into the shoes of the insured, and to cancel and substitute policies, and otherwise to exercise the insured's judgment and discretion, without his knowledge and consent. So it is needless to express any view respecting the legal effect of evidence that would sustain such a customary authority in a case where the other evidence established that the insured, by his orders to and dealings with the broker, had notified the broker that he intended to reserve to himself all questions of waivers, cancellations, and substitutions.

(d) The claim that the railroad company, through Gill, held out Leedom as its agent in such a manner as to justify the insurance company, through Fieweger, in relying on Leedom's having authority to cancel, is wholly without merit. The railroad company was an occasional customer of Leedom's. But even this was not known to Fieweger. The correspondence between Fieweger and Leedom and their entries in their books were unknown to the railroad company and Gill. In this transaction Leedom was subagent

to Fieweger for the insurance company. He might also have been clothed by the railroad company with its discretion in regard to waiver, cancellation, and substitution; but he was not; and neither the railroad company nor Gill did anything to indicate that he was. If Fieweger supposed that Leedom was more than his own subagent, the result came from his failure to inquire.

The foregoing review of the evidence and of the inferences to be drawn therefrom so clearly points to the correctness of the judgment that it would be supererogatory to distinguish from this the cases relied on by counsel.

2. Even if it were conceded that the jury, if the uncontradicted evidence had been submitted to them, might properly have drawn inferences of ultimate fact different from those hereinabove stated, nevertheless the judgment must be affirmed. Both parties moved for a directed verdict. The insurance company thereby joined its adversary in asserting that only one set of inferences of ultimate fact could properly be drawn from the evidence. The parties thus united in a request that the court should make a finding of the ultimate facts, and state thereon his conclusion of law. On review the only inquiries are whether there was any proper evidence to sustain the court's finding, and whether the law was correctly applied to the facts as found. Beutell v. Magone, 157 U. S. 154, 15 Sup. Ct. 566, 39 L. Ed. 654; Merwin v. Magone, 70 Fed. 776, 17 C. C. A. 361. The record shows that the court reviewed the evidence, and stated the ultimate facts substantially as we have done, and thereon announced the legal conclusion that the policies were in force. After the court had thus virtually ended the case, the insurance company could not revive its right to demand a jury trial and to predicate error on the court's refusal to submit the cause to the jury.

3. The insurance company's whole defense proceeded on the theory that it would be enough to prove that Gill had expressly or impliedly authorized Leedom to exercise the insured's discretion as to waiver, cancellation, and substitution. But Gill was not the insured. He was the agent to whom the insured had committed the exercise of judgment and discretion on its behalf. The holder of such a commission cannot pass it on without the consent of the principal. Unless Gill had authority from the directors and managing officers (and the evidence fails to show that he had), he could no more redelegate his trust than the president of the road could step aside and put an office boy in his place.

The judgment is affirmed.