## JACKSON et al. v. BELL.

(Circuit Court of Appeals, Eighth Circuit. June 8, 1926.)

No. 7198.

**1. Appeal and error** ⬿997(3).

In reviewing direction of verdict, where at conclusion of evidence both parties move for directed verdict and do nothing more, appellate court is limited to questions whether there was substantial evidence to support verdict, and whether there was error in applying law.

**2. Frauds, statute of** ⬿158(4).

Promise not to pay debt of buyer of sheep, whose draft on defendant had been dishonored within statute, but original promise directly from defendant to plaintiff to sell sheep for plaintiff and remit proceeds to him, *held* shown by evidence.

In Error to the District Court of the United States for the District of Nebraska; J. W. Woodrough, Judge.

Action by Sam R. Bell against Truman A. Jackson and another. Judgment for plaintiff, and defendants bring error. Affirmed.

Charles F. McLaughlin, of Omaha, Neb., (Edward J. Svoboda and Kennedy, Holland, De Lacy & McLaughlin, all of Omaha, Neb., on the brief), for plaintiffs in error.

Francis S. Howell, of Omaha, Neb. (Edward P. Smith, William A. Schall, and Frank E. Sheehan, all of Omaha, Neb., on the brief), for defendant in error.

Before LEWIS, Circuit Judge, and FARIS and PHILLIPS, District Judges.

PHILLIPS, District Judge. Sam R. Bell (hereinafter called the plaintiff) brought this action against Truman A. Jackson and Jackson-Signall Company to recover the sum of $6,300, with interest at 7 per cent. from March 4, 1920.

Plaintiff was a farmer residing near Osceola, Iowa. Jackson was in the live stock commission business, doing business under the trade name of Jackson-Signall Company at South Omaha, Neb. On or about February 28, 1920, one H. J. Finch purchased 400 ewes from plaintiff. The agreed purchase price was $6,300. On the day of the sale Finch drew a draft on the Jackson-Signall Company for $2,000, and delivered the same to the plaintiff in part payment for the ewes. Plaintiff forwarded the draft to Omaha for collection. On Thursday, March 4, 1920, the ewes were loaded at Osceola and consigned to Jackson-Signall Company at Omaha for the account of Finch. On that day Finch drew another draft on Jackson-Signall Company for the balance of the purchase price, and delivered it to plaintiff.

On or about March 1, Finch also purchased 600 head of sheep from William Bell, a brother of plaintiff, for $9,300, and sold William Bell 29 head of steers for $2,175. It was agreed that the price of the steers should be applied on the purchase price of the sheep.

On Friday, March 5, 1920, plaintiff was advised that the $2,000 draft had been dishonored. Upon receipt of such advice he left im-

mediately for South Omaha, arriving there Saturday morning, March 6th. The ewes were then in the yards of the Jackson-Signall Company. Plaintiff saw Finch in the yards, and asked him why the draft had been dishonored. Finch replied that he did not know what was the matter; that he had been doing business that way right along; and that this was the first time anything like that had happened. Finch called Jackson over to the pens and introduced him to the plaintiff. It was stormy, and Jackson proposed that they go into the office. Thereupon Jackson, Finch, and the plaintiff went to the office of Jackson-Signall Company, where Jackson and plaintiff discussed the matter in the presence of Finch. Concerning that conversation plaintiff testified as follows:

"Q. Narrate what conversation you had in the presence of each of these gentlemen.

"A. Well, I asked Jackson if he was going to pay for those sheep. He said he had several loads of cattle out in the country, had not got a dollar yet, and he didn't feel like putting out money for these sheep right then. I told him I had bought a farm and needed the money to pay on it. * * * He said it was a bad day on Saturday to sell sheep, but they would be sold the first of the week, and I would get my money. * * *

"Q. Was anything said about cattle at that time?

"A. Yes, sir.

"Q. Tell us about that.

"A. There was some 28 steers, head of cattle at my place, and Jackson says, 'I will turn you back the sheep, and you turn me the cattle.' I told him Finch traded those cattle to my brother; that I didn't have anything to do with them; that I didn't want the cattle, I wanted the money for my sheep. * * *

"Q. Going back to the conversation I want you to state just what you said and what Mr. Jackson said when he spoke about Saturday being a bad day to sell sheep. Give us that conversation as fully as you can, and just as near as you can what took place.

"A. Well, I told him I needed this money the first of the week. I would like to get it settled up while here. I didn't care to stay, didn't want to hang around over Sunday. He said it is not necessary to hang around over Sunday. If I wanted him to take care of the sheep they could handle them the same as if I was here.

"Q. What, if anything, else was said about selling the sheep and paying you?

"A. He said the sheep would be sold the first of the week, and I would get my money.

I went home with that feeling, went home the same evening. * * *

"Q. What was said as to the price of those sheep, what you sold the sheep for?

"A. I told him I sold them for $6,300."

On cross-examination plaintiff testified as follows:

"Q. You say Mr. Jackson made the suggestion that he would turn back the sheep to you and you turn back the cattle to him?

"A. Yes, sir.

"Q. What did you say to that?

"A. I told him I didn't want the sheep. I wanted my money to pay on this farm. I wanted the price of the sheep.

"Q. You told him you would not talk anything but money? You remembered the amount of the draft Mr. Finch had given you?

"A. Yes, sir.

"Q. What was said then?

"A. Well, that was the time he said he didn't feel like putting up the money for this bunch of sheep; that he had several loads of cattle out in the country he had not got his money for yet; that Saturday was an off day to sell sheep; that they wouldn't be sold until the first of the week, and then I would get my money."

In a prior proceeding in a state court at Omaha, relative to this same transaction, Jackson testified as follows:

"A. Mr. Finch has been more or less a customer of mine for several years. He has taken cattle out to the country and sheep to the country to sell, and occasionally bought some to ship in. In this case he took a car of cattle to the country, and finally took them to Osceola, and there he bought some sheep, and I sent a man over to help him sell the cattle, and he came back and said he had traded them for some sheep, and they were on the road here, so that day a draft came in for $2,000, and I didn't know anything about the sheep, and he hadn't consulted me about this deal at all, and I didn't know about the sheep, so I turned the draft down until I found out, and the next morning Mr. Bell came over, and the sheep were just being fed, and he wanted to know about this deal, and I said, 'I don't know, we had better go to the office and talk it over.'

"Q. That was after the $2,000 draft had been rejected?

"A. Yes; and the sheep arrived the next morning.

"Q. And Mr. S. R. Bell came over? A. Yes, sir.

"Q. Came to your office? A. Yes, sir.

"Q. Who was present?

"A. Mr. Bell and Mr. Finch and I talked it over between ourselves.

"Q. State what was said?

"A. I told Mr. Bell that inasmuch as he had traded in the cattle for a whole lot of sheep over there, and I didn't feel like financing a whole lot of them in bad weather and sheep having lambs, and I told him we could either return him the sheep and pay him the damages or leave them there, and we would sell them as best we could and settle it that way.

"Q. What did he say to that?

"A. He said, 'All right,' for us to sell them."

In the course of the conversation above referred to, Jackson stated that the 29 head of steers belonged to him. During the week following the conversation between plaintiff and Jackson at Omaha, plaintiff called.Jackson two or three times over the telephone and discussed the sale of the ewes. Jackson advised that he had sold part of the ewes, but had not yet been able to sell all of them. Jackson eventually sold all of the ewes, and received as the net proceeds thereof $4,070.-82. Jackson credited Finch with $2,175 on account of the steers which Jackson had turned over to Finch, and paid the balance of the net proceeds to Finch. After the ewes were all sold, plaintiff demanded a settlement with Jackson over the telephone, and again forwarded the drafts to Omaha for collection. The drafts were again dishonored by Jackson.

Prior to the transaction in question, Jackson had paid for cattle purchased by Finch on the live stock exchange, and it was the practice of Finch in making purchases of live stock to draw drafts on Jackson in payment of the purchase price.

After the drafts had been dishonored the second time by Jackson, and after plaintiff had sought for some time without avail to obtain a settlement, he brought this action. At the conclusion of the evidence, both plaintiff and defendant moved for a directed verdict. The trial court directed a verdict in favor of the plaintiff for the net proceeds of the sale of the ewes, together with accrued interest thereon, amounting in all to $5,545.46. Judgment was entered on this verdict, and Jackson sued out a writ of error to this court.

[1] There are many assignments of error, but they present the single question: Was there substantial evidence to support the verdict?

In Meyer & Chapman State Bank v. First National Bank of Cody (C. C. A. 8) 291 F. 42, this court, speaking through Judge Kenyon, said:

"It·is the general holding of the federal courts that, where both parties to an action, at the conclusion of the testimony, ask for an instructed verdict, and do nothing more, it is a request to the court to find the facts, and the appellate court is 'limited, in reviewing its action, to the consideration of the correctness of the finding on the law, and must affirm if there be any evidence in support thereof.' Beuttell v. Magone, 157 U. S. 154, 15 S. Ct. 566, 39 L. Ed. 654. See, also, Western Express Co. v. United States, 141 F. 28, 72 C. C. A. 516; Lehnen v. Dickson, 148 U. S. 71, 13 S. Ct. 481, 37 L. Ed. 373; Runkle v. Burnham, 153 U. S. 216, 14 S. Ct. 837, 38 L. Ed. 694; Williams, as Receiver of the First National Bank of Bayonne, N. J., v. Vreeland, 250 U. S. 295, 39 S. Ct. 438, 63 L. Ed. 989, 3 A. L. R. 1038; Sena v. American Turquoise Co., 220 U. S. 497, 31 S. Ct. 488, 55 L. Ed. 559; Anderson v. Messenger, 158 F. 250, 85 C. C. A. 468; Freeman v. W. B. Moses & Sons, Inc., 285 F. 898, 52 App. D. C. 164; Thomas-Bonner Co. v. Hooven, Owens & ·Rentscheler [Rentschler] Co. (C. C. A.) 284 F. 386. Under such circumstances, the only questions open to the appellate court are: (a) Was there substantial evidence to support the findings? and (b) was there error in the application of the law? Phenix Ins. Co. of Brooklyn, N. Y., v. Kerr, 129 F. 723, 64 C. C. A. 251, 66 L. R. A. 569; Insurance Co. of North America v. Wisconsin Cent. Ry. Co., 134 F. 794, 67 C. C. A. 300; McCormick v. National City Bank of Waco, 142 F. 132, 73 C. C. A. 350, 6 Ann. Cas. 544."

See, also, Union Electric Steel Co. v. Imperial Bank of Canada (C. C. A. 3) 286 F. 857, 862; Speelman v. Iowa State Traveling Men's Ass'n (C. C. A. 8) 4 F.(2d) 501, 502; Linsky v. U. S. (C. C. A. 1) 6 F.(2d) 869, 870.

[2] Counsel for the plaintiff, Bell, contend that the transaction at Omaha resulted in a new contract and an original promise on the part of Jackson based upon a sufficient consideration to pay the sum of $6,300 for the ewes.

Counsel for Jackson contend: First, that the evidence did not establish a promise on the part of Jackson to pay for the ewes; and, second, that, if the evidence did establish any such promise, it was a promise to answer for the debt of Finch and, not being in writing, was within the statute of frauds, and nonenforceable.

When plaintiff arrived in Omaha, the ewes were then in the possession of Jackson, and Jackson knew that the ewes had been sold by plaintiff with the understanding that drafts would be drawn on Jackson, and that Jackson would pay for the ewes as he had previously done on other transactions by honoring the drafts of Finch. Plaintiff inquired of Jackson if the latter was going to pay the drafts. Jackson did not deny liability on the drafts or refuse to pay them, but said that he had several loads of cattle out in the country, and had not gotten a dollar for them yet, and that he did not feel like putting out money for these ewes right then, and that Saturday was a bad day to sell the ewes. He advised plaintiff that the 29 head of steers which had been traded to William Bell belonged to him. He proposed that the steers be returned to him, and that he return the ewes to plaintiff. This proposal plaintiff refused to accept. Jackson then offered to return the ewes to plaintiff and pay him damages, and this proposal plaintiff rejected, explaining that he had purchased a farm and needed the money. Jackson then stated that, if plaintiff would leave the ewes with Jackson until the first of the following week, he would then sell the ewes and pay plaintiff his money. This proposal plaintiff accepted. During the entire transaction Jackson undertook to deal with the steers and the ewes as though they belonged to him. Finch was present during the negotiations between Jackson and plaintiff, and made no objection to the proposals made by Jackson, but fully acquiesced therein. The trial court reached the conclusion, which is justified by the evidence, that the transaction amounted to a contract mutually agreed to by plaintiff, Jackson, and Finch; that the sale to Finch should be rescinded; and that Jackson should sell the ewes for plaintiff and remit the net proceeds of the sale to plaintiff. Jackson's testimony at the proceeding in the state court at Omaha fully warranted this conclusion on the part of the trial court. The promise on the part of Jackson was not to pay the debt of Finch, but was an original promise directly from Jackson to plaintiff to sell the ewes for plaintiff and remit the proceeds of the sale to him.

It follows that the finding of the trial court was supported by substantial evidence, and entitled plaintiff to a judgment for the amount of the net proceeds of the sale made by Jackson.

The judgment is affirmed.