Thomas F. COSTELLO, Plaintiff-Appellee, Cross-Appellant,

v.

OPPENHEIMER & CO., INC., Defendant-Appellant, Cross-Appellee.

Nos. 80–2228, 80–2294, 80–2551 and 80–2590.

United States Court of Appeals, Seventh Circuit.

Argued April 8, 1981.

Decided June 22, 1983.

---

James E. Beckley, J. David Montague, Chicago, Ill., for defendant-appellant, cross-appellee.

George W. Hamman, Hamman, Benn & Miller, Chicago, Ill., for plaintiff-appellee, cross-appellant.

Before BAUER, Circuit Judge, FAIRCHILD, Senior Circuit Judge, and HOFFMAN, Senior District Judge.*

FAIRCHILD, Senior Circuit Judge.

Plaintiff commenced this action under the federal securities laws, alleging that the brokerage firm handling his account had defrauded him through various misrepresentations and by engaging in excessive trading ("churning") for the purpose of generating commissions. In a special verdict, the jury found against defendant on both grounds and awarded damages of $97,-000. The district court then denied a motion for a new trial, but granted defendant's motion for judgment *n.o.v.* to the extent of reducing the award to $53,500. On appeal, we conclude: (1) that there was insufficient evidence to support liability for misrepresentation; (2) that notwithstanding the absence of expert testimony or traditional forms of statistical evidence churning was adequately established; and (3) that as to churning damages, plaintiff proved entitlement to $15,065.92 in wrongfully charged commissions, but failed to prove the amount of realized losses sustained by his account. Therefore plaintiff will have the option of remitting that portion of the award in excess of $15,065.92 or submitting to a new trial on the issue of churning and resulting damages.

*The Facts*

In September 1976, Thomas F. Costello opened an options trading account at Oppenheimer & Co., Inc. A college graduate with a degree in business administration and a vice-president of National Can Corporation, Costello was not unfamiliar with options markets. His career had given him some exposure to various commodities programs and since 1975 he had traded options through two other brokerage firms, Merrill Lynch and White Weld. At Merrill Lynch, Costello's account was handled by Ronald Brownlow. When Brownlow moved to Oppenheimer in 1976, he solicited Costello's business and eventually secured the transfer of Costello's Merrill Lynch and White Weld accounts.

Costello testified that prior to the transfer he told Brownlow that he wanted the principal of his new account to be absolutely protected, just as it had been at Merrill Lynch. According to Costello, Brownlow assured him that the principal would remain safe and sound, that there would be better record keeping than at Merrill Lynch, and that he could expect to earn about a 20% return on his investment. Brownlow insisted that he would only handle the account on a discretionary basis, so that he could take advantage of quick shifts in the market without securing Costello's prior approval of transactions. Costello agreed to this condition and executed a power of attorney. Costello said that he asked Brownlow to put into writing the details of their understanding as to how the account would be handled, but that Brownlow suggested that Costello draft the memorandum to which Brownlow would then object if there was any difference. Costello testified that thereafter he sent a handwritten letter to Brownlow, dated September 4, 1976, which read as follows:

"Ron

"Confirming the agreement reached in my office, you will receive my signed transfer forms before the week is over. I'll transfer the Merrill Lynch first and then the $100,000 from White Weld when the certificate matures.

"We've agreed to continue on the plan which protects my equity completely. I don't want to change that, since some of

* Senior District Judge Walter E. Hoffman of the Eastern District of Virginia is sitting by designation.

the money has been borrowed. Your assurance that we can continue to realize at least 20% return on the trading is fine. Lets not worry about trying to extend that by any long chances.

"You'll set options naked—at least 20% out of the money and cover when options between $2 and 5 move ½ point against us or 1½ to 2 points favorable. Stop action will occur on those priced at $5–7 at $1 unfavorable and $3 favorable. The proceeds will be immediately re-invested in more tax free issues. The tax free income is to be sent to me.

"Since I'm traveling—I have to trust you and Oppenheimer. Keep me informed. The new records look like my old problem with Merrill is over. Every three months is O.K.—but if you say every 30 days its fine with me!

"Good luck in the new job. Let's make some money together.

"Tom Costello"

At trial, there was conflicting testimony as to whether Brownlow received or acknowledged the letter. In any event, the Merrill Lynch account was transferred on September 7, 1976, and the White Weld account in April 1977. As a result, Costello placed a total of $235,384.65 with Oppenheimer.

Costello received confirmation slips informing him of each of the trades in his new account. But these, he said, were sometimes late and frequently inaccurate, with correction statements for the same transaction often being issued two or three times. Monthly summaries were also issued, but, according to Costello, were received irregularly. While conceding that he tried to match up confirmations to see whether he was making money, Costello maintained that it was impossible to fully follow the activity in his account, because of the record dissemination problem, the fact that he had been periodically hospitalized, and because the opposing action upon which the profitability of any particular transaction depends frequently does not occur until many months after a position is first placed in an account.

Brownlow testified that he traded Costello's account "pretty heavily" in January and February 1977 because the market was "relatively high," and that as the market then moved on the downside he was able to close out many positions. Profits during this period, he said, were "real fine," in the area of 20–25%, realized gains. By mid-March, however, too limited a number of positions were available to allow much account activity, so Brownlow decided to go on vacation. From March 25 to April 10, 1977, Daniel Piet, Brownlow's partner whom Costello had previously met, handled his accounts.[1] Prior to leaving, Brownlow instructed Piet on how to manage the Costello account and asked him to close out a few spread positions, but not to put on any new ones.

While Brownlow was away, Costello received certain confirmation slips which seemed to him "completely out of line" with the trading parameters upon which he and Brownlow had agreed. Costello informed Piet of this and objected when Piet said that the trades were within the framework of the program. Costello testified that when he returned Brownlow called and told him "we have a little problem with your account. There [have] been some positions put on and some taken off that I do not agree with...." According to Costello, Brownlow further said that "on these trades ... there were losses incurred, that if he [Brownlow] had made them himself they would not have occurred, but not to worry, that he would solve the situation." Brownlow corroborated this testimony, saying that when he learned of the trades he was "upset" because "some of the positions that were put on ... did not fit my criteria" and were "outside the parameters for the handling of the account." Brownlow did not specify which trades were non-conforming, nor did he estimate the damage caused by each improper trade.[2]

---

1. Piet was a partner in the Costello account between March and July, 1977. It appears, that except when on vacation, Brownlow carried the primary responsibility for the account.

2. At trial, plaintiff's attorney asked Brownlow to identify the trades that were put on in plaintiff's account during his absence. Brownlow, looking at the monthly statement dated April

According to Brownlow, an unspecified number of trades were again put in the account by Piet, while he was away from the office between June 25 and July 5, 1977. Although he was not asked to identify these trades or to quantify their effect upon the account, he did say that immediately upon his return on July 5 he and Piet decided to terminate their partnership.

Brownlow periodically informed Costello of the status of his account. Around July 25, 1977, he notified Costello that performance had been good but that there had been a slight drop-off due to the trades which Piet had made. Brownlow testified, after examining a writing dated July 22, that he told Costello that the market value of the account then stood at $253,000. On October 31, 1977, Brownlow provided another written valuation which stated that the account was down $1,188 (from its starting position of $235,384.65). According to Costello, Brownlow apologized for the poor performance and said "I want you to know the facts, that the performance is not as I have promised but that there were things done with your account that I am not responsible for and I have been unable to cover for you to make up those losses."[3] On November 18, 1977, Brownlow again advised Costello of the account's status and said that its net value had dropped to $222,710.

Between July and November 1977, there was little activity in Costello's account. Brownlow testified that his trading was mainly defensive and that he was trying to reduce losses that were occurring in the account.

On December 2, 1977, Brownlow's employment with Oppenheimer terminated.[4] Prior to that date, he wrote to Thomas O'Donnell, an Oppenheimer vice-president and local branch manager, explaining why he had kept Costello's and other accounts relatively inactive. The memo, dated November 19, 1977, stated:

"In my opinion, you deserve to know exactly 'why' I have 'held off' in the last several months. You may not want to know—but you deserve it. Here goes: "*Aug. 1*

"Dan & I split; good accounts, rather all accounts since we began in January to Dan.—All were in trouble from the view of 'loss' and outstanding positions. During the months of June & July, *Dan,* not Ron, churned these accounts; not for the benefit of the clients (his house) but because he could see 'the end' in sight. 'The end' meant—the closing of the accounts, lawsuits, etc. Truthfully and candidly, Dan 'churned' the accounts whenever I would leave the office—to the john, lunch, or whatever.

"My biggest fault was *not* too stop it sooner. It was apparent in May-June.— OK, its done.

"You contributed to this problem by stroking him to[o] much. Good for business, sure. Good for Dan, wait and see. * * * Many of these accounts have generated over [$20,000–$25,000] in commissions on a [$100,000] equity—give me a break and ask me if that's management. The numbers will catch up with everyone. My choice was to 'stop' it.... And I did.... And happy with it. OPCO may not like it but R. Brownlow does."

(Emphasis and elipses in original; asterisks indicate portion not admitted by trial court.)

Costello protested the handling of his account to Brownlow throughout the fall, and finally met with O'Donnell in early December. According to Costello, he told O'Donnell that he was considering legal action, but O'Donnell suggested that was unnecessary because any problems that exist-

---

29, 1977, mentioned fourteen trades, but did not say how many did not fit his parameters. Following an objection by defense counsel, plaintiff's counsel switched to a different line of questioning and failed to pursue the subject. *See* Record, pp. 283–286.

**3.** Record, p. 174.

4. Oppenheimer asserted at trial that the action resulted from Brownlow's excessive absenteeism, whereas Brownlow contends that it was a consequence of his refusal to manage his accounts in a way that placed the firm's interests above clients'.

ed could be resolved in-house. O'Donnell, he said, recognized that Costello was entitled to some redress and told him that his investment could be restored to profitability by changing from options trading to arbitrage, an exclusive program involving the purchase of stock in companies about to merge or be taken over by other companies.[5] Costello testified that O'Donnell assured him that as one of the few persons with this type of account he would soon "be smiling all the way to the bank" and "making more money than ever."[6]

Costello's arbitrage account was assigned to Robert and Dean Rosenberg, two brothers who were Oppenheimer account executives. At various times, Costello informed each of the Rosenbergs that his foremost concern was preservation of principal, but that as long as they did not touch principal, they had the power to invest Costello's money, with Oppenheimer making all the decisions. He also informed Robert Rosenberg that he had earlier been told he would earn about 20% on his money and wanted to know if he could continue to expect that kind of results. Rosenberg responded that arbitrage accounts, if handled properly, were the most profitable type of accounts that Oppenheimer had.

Other discussions were held in January and February with O'Donnell and Nathan Gantcher, a senior vice-president of Oppenheimer. Costello testified that Gantcher, like O'Donnell acknowledged that the account had been mishandled, and agreed to see whether any additional redress was available to Costello. A letter from Aaron Teitelbaum, Oppenheimer's associate director for compliance/law, dated February 28, 1978, informed Costello that Oppenheimer would not accede to Costello's request for reimbursement of approximately $279,000. However, O'Donnell thereafter assured Costello that Teitelbaum's letter must have been based on some misunderstanding and that he would try to straighten things out.

Early in January 1978, Costello asked Robert Rosenberg for a current statement of the value of his account so that he could measure the performance of the arbitrage program. After repeated requests for this information, Costello received, in early April, a letter from Robert Rosenberg, dated March 3, 1978, accompanied by an account analysis. The account analysis included a representation: "Market Value of Portfolio as of December 30, 1977 $275,906.25." The letter explained: "Finally the market value of your portfolio as of December 30, 1977 was derived by taking the market prices of all your Municipal Bonds and Stocks that were long in the account plus the market value of all long option positions minus the combination of your credit and debit balance minus market prices of all short options. This would mark you to the market as of December 30, 1977." In a phone conversation shortly following receipt of the letter, Costello thanked Robert Rosenberg for the information and said that if the account was able to continue producing results like that then all of his anger was over.

Robert Rosenberg left Oppenheimer's employ on April 7, 1978. His brother, Dean Rosenberg, who was still at Oppenheimer, called Costello and asked to keep the account. Costello reiterated the trading parameters and, after being assured that none of the past problems would recur, agreed. At a meeting on June 1, 1978, Dean Rosenberg advised Costello that value of his account then stood at about $248,000. Costello, expressing disbelief, told Rosenberg that he could not understand where the money had gone, since as late as April 5 he had received figures valuing the account at approximately $275,000. He suggested that there was stealing going on in the "back room." Rosenberg indicated that perhaps there was some error in the figure and that he would look into it.

Before receiving a follow-up response, Costello learned, on July 12, 1978, that Dean Rosenberg had left Oppenheimer and that his account had been re-assigned to yet

---

**5.** The district court observed that the evidence showed arbitrage to be an even more speculative venture than trading in options.

**6.** Record, p. 184.

another account executive. Costello then told O'Donnell that he was going to look for a new brokerage firm and wanted to know the value of his account. He related the figures earlier provided by the Rosenbergs, not noted that Dean Rosenberg had said that the $248,000 figure might be unreliable. O'Donnell promptly checked the status of the account and advised Costello that none of the earlier figures was right and that the account was worth only about $180,000. Costello again suggested that there was stealing going on, but O'Donnell denied this and said that depreciation of the account was simply due to the risks of the market. Costello responded that he intended to get an attorney and that he did not want any more trades made in his account without his approval. O'Donnell agreed, but indicated that there would be "cosmetic close-outs" and limited transactions of that nature. According to Costello, Oppenheimer's closing of the account was "very slow," the transfer finally being effected on September 15, 1978. As of that date, the market value of the account was $166,780.95.

### Proceedings in the District Court

Costello commenced this action for damages under the provisions of § 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b–5 promulgated thereunder (17 C.F.R. 240.10b–5). He alleged that the defendant, Oppenheimer, through its representatives, had made material misrepresentations or had omitted to state material facts in connection with the purchase or sale of securities. He also charged that Oppenheimer had "churned" his account by engaging in excessive trading for the purpose of generating commissions.

The jury answered special interrogatories finding that misrepresentations or omissions did occur between January and April 1978 and that Costello's account had been churned between March and July 1977. It awarded Costello $97,000 in damages. Subsequently, the district court denied a motion by defendant for a new trial, finding there

was sufficient evidence to support the jury's determinations of liability. The court did, however, grant defendant's motion for judgment n.o.v. to the extent of reducing the award of damages from $97,-000 to $53,500. It permitted recovery only of those amounts by which the market value of Costello's account declined during the periods of March 1977 thru July 1977 and December 30, 1977 thru June 1, 1978, in addition to commissions paid to Oppenheimer during the churning period.

Subsequently, Oppenheimer appealed and Costello cross-appealed. Essentially, Oppenheimer argues that the evidence failed to prove the requisite elements of churning and failed to link any misrepresentation to any element of damage. Costello, on the other hand, challenges the district court's reduction of damages and seeks to have the jury's award reinstated, or alternatively, requests that the judgment of the district court be affirmed.

### Liability for Churning

With respect to the finding of liability for churning, Oppenheimer has raised no challenge to the district court's evidentiary rulings or instructions to the jury. It contends that the verdict was premised on insufficient evidence. Consequently, the question presented by this aspect of the appeal is whether there was any view of the facts which could support the jury's finding that churning occurred between March and July 1977.[7] If so, the motions for a new trial or for judgment n.o.v., insofar as they relate to this issue, were properly denied.

The term "churning," in the context of securities regulation, denotes a course of excessive trading through which a broker advances his own interests (e.g., commissions based on volume) over those of his customer. See Fey v. Walston & Co., Inc., 493 F.2d 1036, 1040 n. 1 (7th Cir.1974); see generally, Jacobs, The Impact of Securities Exchange Act Rule 10b–5 on Broker-Dealers, 57 Cornell L.Rev. 869, 929–936

---

**7.** There is no dispute that in an appeal of this nature the evidence must be viewed favorably to the successful plaintiff and that debatable inferences must be resolved against the party challenging the verdict. See Fey v. Walston & Co., Inc., 493 F.2d 1036, 1044 (7th Cir.1974).

(1972); Note, *Churning by Securities Dealers,* 80 Harv.L.Rev. 869 (1967). As a scheme, the essence of which is deception of a relying customer, *see Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 494 F.2d 168, 171 (10th Cir.1974), churning, as a matter of law, is considered a violation of section 10(b) and Rule 10b–5, *see Hecht v. Harris, Upham & Co.,* 430 F.2d 1202, 1206–1207 (9th Cir.1970). There is no single test or formula for proving that churning has occurred, but it is generally said that a plaintiff must show (1) that the broker exercised control over the transactions in the account and (2) that the amount of trading was excessive.[8] *See* Jaffe, Broker-Dealers and Securities Markets 308 (1977).

In the instant case there can be little doubt concerning the first element. Control is clearly established where the account is discretionary, a power of attorney has been executed in favor of the broker, and the trades completed without prior approval by the customer. *See* Jacobs, *supra,* 57 Cornell L.Rev. at 930 & n. 355, and cases cited therein. Here, each of these factors was present and together they plainly support a finding that Oppenheimer was making the decisions, not merely following Costello's orders.

■ The second question—whether Oppenheimer abused its control by engaging in excessive trading—requires more detailed consideration. The essential issue of fact is whether the volume of transactions, considered in light of the nature and objectives of the account, was so excessive as to indicate a purpose on the part of the broker to derive a profit for himself at the expense of his customer. *See Hecht v. Harris, Upham & Co.,* 283 F.Supp. 417, 435 (N.D.Cal. 1968), *modified on other grounds,* 430 F.2d 1202 (9th Cir.1970). The starting point for such an inquiry is, of course, delineation of the customer's investment goals, for those objectives significantly illuminate the context in which the trading took place and, indeed, form standards against which the allegations of excessiveness may be measured. *See Fey, supra,* 493 F.2d at 1045. Where, for instance, the goals of an investor are aggressive or speculative, as opposed to conservative and circumspect, it is easier to conclude that a given course of trading has not been excessive. *See, e.g., Marshak v. Blyth Eastman Dillon & Co., Inc.,* 413 F.Supp. 377, 379 (N.D.Okla.1975) (no liability where plaintiff's stated objective was "quick short-term profits").

■ We think the jury could fairly have concluded that Costello's investment objectives were not unduly ambitious. Among other things, the testimony showed that although Costello wanted to earn a high return on his money, he was primarily concerned with preserving principal. He continually stressed this point in his dealings with Brownlow and the Rosenberg brothers. The record also shows that Costello and Brownlow agreed upon specific criteria for the handling of the account, as is evidenced by the terms in the letter of Sep-

---

**8.** A few courts have suggested, as a third element, that the customer must also have been relatively unsophisticated about the market. *See Marshak v. Blyth Eastman Dillon & Co., Inc.,* 413 F.Supp. 377, 379 (N.D.Ok.1975). But while it is true that most successful churning plaintiffs have fit within this category, *see Horne v. Frances I. du Pont & Co.,* 428 F.Supp. 1271, 1274 (D.C.1977), imposing lack of sophistication as an absolute requirement would appear to go too far. Even a savvy investor may choose, for various reasons, to entrust the handling of his account to a broker and there is no reason to immunize that broker if he exercises control and intentionally trades the account excessively. The better view would seem to be that business sophistication is simply another consideration bearing upon the issue of control. *See generally* Jaffe, *supra,* at 308. Where di-

rect evidence is wanting and control must be proved circumstantially the customer's naivete is relevant, "since dependence on the dealer increases to the extent that the customer is unable to carry out market transactions on his own." Note, *supra,* 80 Harv.L.Rev. at 873. Here, however, as discussed later in the text, there is more than ample direct evidence to establish control on the part of the defendant, and it is thus not necessary to determine that element by reference to the presence or absence of business sophistication.

The customer's understanding of the market might also be relevant to whether the broker may successfully assert a defense to churning based on the fact that the customer was aware of the trades being made, appreciated their significance, yet failed to object. *See* the discussion *infra* at p. 1370.

tember 4, 1976, which detailed the precise conditions under which naked options should be sold or stop orders should be placed. That same letter stated that Costello was not interested in taking "any long chances."

Delineation of an investor's goals is, however, only the first step in showing that a particular course of trading has been excessive. In the usual case, statistical evidence is introduced to establish the level of activity in the account and the amount of profit to the broker. For example, counsel may attempt to show that the ratio of the broker's commissions to the size of the account was unusually large, that there was a pattern of "in and out" trading[9] or "cross trading,"[10] that the "turnover rate"[11] was high, or that particular securities were held for only a short period of time or were of questionable quality. *See generally* Jaffe, *supra* at 308–312. While none of these tests by itself necessarily demonstrates churning, *see id.* at 312, each may aid the factfinder by introducing some measure of objectivity or certainty into an otherwise recondite subject. For similar reasons, it is customary to call an expert to testify on the question of whether excessive trading has taken place. *See, e.g., Fey, supra,* 493 F.2d at 1044; *Hecht, supra,* 283 F.Supp. at 437, *modified on other grounds,* 430 F.2d 1202; Jaffe, *supra,* at 320.

In the present case, Costello's counsel introduced none of these traditional forms of evidence. No expert witness was called on behalf of the plaintiff and no testimony was presented concerning "turnover rate," "in and out trading," "cross trading," the quality of particular investments, or the length of time securities were held. And, while some evidence—largely in the form of raw data—was introduced from which the jury could conclude that commissions were higher during the churning period than in earlier months, there was no testimony that those commissions were unusually large in comparison to the size of the account.[12] On appeal, Oppenheimer now argues that in the absence of expert testimony or the usual forms of objective statistical evidence, the verdict of liability may not stand.

Plainly, it would seem to be the better course to place before a jury such expert testimony and objective evidence as is available, and, indeed, the churning plaintiff who determines not to do so proceeds at some risk. *See, e.g., Landry v. Hemphill, Noyes & Co.,* 473 F.2d 365, 374 (1st Cir. 1973); *Booth v. Peavey Company Commodity Services,* 430 F.2d 132, 135 (8th Cir.1970). Yet this is not to say that a case involving churning can never go to the jury in the absence of these kinds of technical and expert evidence. *Cf. Booth, supra,* 430 F.2d at 135; *but see* Jaffe, *supra,* at 320 ("expert may ... be essential to qualifying many

**9.** The term "in and out" trading denotes the sale of all or part of a customer's portfolio, with the money reinvested in other securities, followed by the sale of the newly acquired securities. It is a practice extremely difficult for a broker to justify. *See* Note, *supra,* 80 Harv.L.Rev. at 876.

**10.** "Cross trading" occurs where a broker arranges for transfers between customers. It is a highly suspect practice unless the dealer can demonstrate that the accounts had different purposes and that the particular securities were suitable for one account but not another. *See* Note, *supra,* 80 Harv.L.Rev. at 877.

**11.** The "turnover rate" of an account is the ratio of the total cost of purchases made for the account during a given period of time to the amount invested, and can be computed in a variety of ways. *See* Note, *supra,* 80 Harv.L. Rev. at 875. It affords the court an opportuni-

ty to determine how many times in a given period the securities in a customer's account have been replaced by new securities recommended by the broker. Whether a particular turnover rate is excessive depends on the objectives of the customer. *See generally* Jaffe, *supra,* at 309–310.

**12.** The commissions for January and February 1977 were $1,561.47 and $1,010.97, respectively. In March, when Piet started trading, they rose to $1,996.38. In April, May, June, and July, they were $4,549.10, $3,739.81, $2,072.11, and $2,708.52. While these figures, standing alone, might seem to show that commissions increased during the churning period, defendant stresses that they were not out of line with those charged nearly a year later during a period in which no churning is alleged to have taken place. In March, April, and May 1978 commissions were $4,635.11, $2,949.14, and $4,527.82, respectively.

... documents and ... reports"). Despite the weaknesses in plaintiff's case, we think there were sufficient facts to support a jury finding of excessive trading.

There was testimony showing that Costello and Brownlow reached a specific understanding concerning the handling of the account, that Piet was informed of these terms, and that nevertheless some of the trades made by Piet between March 25 and April 10, 1977, did not comply with these criteria. The jury was entitled to conclude that the non-conforming trades constituted excessive activity. In addition, Brownlow's letter of November 19, 1977, to O'Donnell acknowledged that, in June and July 1977, Piet had churned the accounts which he and Brownlow shared, and that, in fact, Piet's churning activities were apparent as early as May 1977.[13] Since Costello's account was among this group and there was testimony that Piet had placed an unspecified number of trades in the account between June 25 and July 5, 1977, the jury could reasonably infer that the account had again been excessively traded. Finally, O'Donnell and Gantcher admitted in their discussions with Costello that his account had been mishandled. While these statements did not necessarily mean there had been churning, the jury was entitled to give them weight in connection with the other evidence that Piet had disregarded the parameters of the Costello account and had engaged in churning. Considered as a whole, plaintiff's evidence, thin though it was, created a jury issue whether there had been churning.

Oppenheimer points to Costello's receipt of trading confirmations and monthly statements. Courts have held that where a sophisticated investor regularly receives information concerning the transactions in his account and fails seasonably to object, he may be barred by the doctrines of waiver, estoppel, laches, or ratification from later asserting the wrongdoing. *See, e.g., Ocrant v. Dean Witter & Co., Inc.,* 502 F.2d 854, 858–859 (10th Cir.1974); *Merrill Lynch,*

*Pierce, Fenner & Smith, Inc. v. Bocock,* 247 F.Supp. 373, 376–377 (8th Cir.1970); *cf. Fey, supra,* 493 F.2d at 1049–1051; *Hecht, supra,* 283 F.Supp. at 428, *modified on other grounds,* 430 F.2d 1202; Jaffe, *supra,* at 316–319. Oppenheimer maintains that because Costello understood the market and admitted examining the statements he received, he should be precluded from recovering for churning.

We cannot agree. Defendant's argument rests upon a version of the facts favorable to it, whereas on an appeal such as this, we are bound to presume that the jury viewed the evidence in the light most favorable to the plaintiff. *See Fey, supra,* 493 F.2d at 1044. There was testimony at trial which indicated that the confirmations were frequently late or inaccurate. There was also testimony that Costello, in fact, did protest the non-conforming trades to Piet, and there was no indication that he ever abandoned that protest, though apparently he did rely upon the assurances of various employees of Oppenheimer that the problem would be resolved.

### Liability for Misrepresentation

■ The next question is whether there was evidence to support the jury's finding that Oppenheimer made misrepresentations or material omissions during the period of January to April 1978. The principal misrepresentation alleged by Costello is that the defendant falsely stated in its letter of March 3, 1978, that the market value of the account on December 30, 1977, was $275,906.25. Costello claims that the actual market value on the date was only approximately $191,000, and that had he known of this depletion, he would have terminated his association with Oppenheimer. In response, Oppenheimer argues that there is no evidence in the record, other than unsworn statements by plaintiff's counsel during closing argument, to support the $191,000 market valuation figure on which plaintiff's claim depends.

---

**13.** There was no objection to admission of the November 19th letter on the ground that Brownlow was unqualified to render an opinion whether churning had occurred. Brownlow, a college graduate, had passed the commodities exam and registered representative test, had been licensed since 1973, and had been employed in the securities business since 1972.

The district court accepted plaintiff's $191,000 figure, but did not discuss the defendant's lack of evidence challenge. As sole support for the figure, the district court cites plaintiff's Exhibit No. 55 and page 7 of a memorandum submitted to the court by plaintiff on June 17, 1980, in opposition to defendant's motion for a new trial or judgment *n.o.v.* We have carefully reviewed these documents and do not find evidentiary support for the $191,000 figure.

Exhibit 55 is the three page monthly statement issued to Costello for the period ending December 30, 1977. It sets forth the opening and closing balances for various types of accounts that were then held in Costello's name. The total of the closing balances is $269,034.84. The balances appear to reflect assets at cost. There is no appraisal at market.

The page cited in plaintiff's memorandum is also of little help. The full extent of its relevant discussion is as follows:

"By December 30, 1977 the value of the account was down to approximately $191,000. (PX55.) This value can be ascertained from the exhibits by adding the value of the bonds, stocks, cash, and long options, and subtracting therefrom the margin amount owed and short options."

No figures for the enumerated items are given in the memorandum and no calculations are provided. Consequently, we are at a loss to know how plaintiff performed the computations.[14] Moreover it is not possible to match all the six categories listed in the second quoted sentence with items on Exhibit 55. The exhibit lists only four "closing balances" for the date December 30, 1977. Two of these are designated as being for the "cash account" and the "margin account," so it is clear to which items in plaintiff's formula they correspond. The other two, however, are described simply as balances for a "type 3 account" or a "type 9 account." [15] We have no way of knowing to which of the remaining four categories these latter two balances correspond or why there are not balances for all four. Consequently, the brief discussion in the memorandum is of no assistance to us in considering Exhibit 55.

In attempting to uphold the district court's finding that the December 30, 1977, value of the account was $191,000, we have examined the record of the trial, the briefs on appeal, and the statements of counsel at oral argument. But these, too, give no clue as to the figure's derivation. The alleged incorrectness of the $275,906.25 value stated in the Rosenberg letter of March 3rd was first mentioned at trial during closing argument for plaintiff. Counsel stated:

"You will have [in] evidence the monthly records [issued by Oppenheimer to Costello] . . . . [Y]ou can[,] by going back and forth, taking various transactions and valuing them[,] . . . come back with the value of the account as of December 30, [1977]. It is $191,000. Oppenheimer knew that all along. . . ." [16]

The defense countered during its closing that neither Costello, Brownlow, nor any other sworn witness testified that the figure in the Rosenberg letter was incorrect, and that the statements of plaintiff's counsel were not evidence.[17] On rebuttal plaintiff's counsel said that the exhibits supported his claim.[18] None of this vague rhetoric ever so much as suggested which of the numerous monthly statements or other documents the jury should have directed its attention to. Consequently, it is of no aid

---

14. One would think that if the value would be computed from Exhibit 55 and other documents Costello's brief before the district court or on appeal would present the computation in answer to defendant's challenge.

15. The closing balances shown as of 12–30 were:

| | |
|---|---|
| Cash Account | $-0- |
| Margin Account | $ 87,917.13 |
| Type 3 Account | $-0- |
| Type 9 Account | $181,117.71 |

16. Record, p. 574.

17. Record, pp. 591–592.

18. The sum of plaintiff's counsel's relevant statements on rebuttal is as follows:
"Mr. Beckley [defense counsel] said, you know, 'Hamman [plaintiff's counsel] is the only one that said the $275,000 figure wasn't right.' Well, the monthly statements show. He isn't denying it. He didn't tell you what the figures were." (Record, p. 606.)

in determining whether there is support in the record for the $191,000 figure.

The same is true of the briefs on appeal. In answer to the charge in Oppenheimer's brief that there was no basis for figure advanced by plaintiff, plaintiff's brief stated only that:

"Defendant does not state what the value was at that time. In addition, defendant has ignored the monthly statements and confirmations that were introduced into evidence. As counsel for plaintiff advised the jury, the value of the account can be ascertained by working through the exhibits." [19]

No further illumination was shed on the question at oral argument.

We see no choice other than to conclude that plaintiff has failed to demonstrate that the market value of the account on December 30, 1977, was $191,000 or any other amount substantially less than the amount represented by defendant. It follows that the plaintiff has failed to show that the March 3 letter constituted a misstatement.[20]

Alternatively, Costello argues that other misstatements or omissions during the period of January to April 1978 justify the jury's special verdict. We are unable to agree. Costello relies mainly on O'Donnell's statements that by switching to the arbitrage program he would soon "be smiling all the way to the bank" and "making more money than ever," and Robert Rosenberg's statement that arbitrage accounts were the "most profitable" that Oppenheimer had. As to what O'Donnell said, it is sufficient to note that the record indicates that those statements occurred in December 1977 and thus did not take place within the misrepresentation period defined by the jury.[21] And, as to the Rosenberg comment, there has been no showing that, as a general rule, arbitrage accounts were not the most profitable at Oppenheimer. Quite possibly, Costello's dealings with O'Donnell, the Rosenbergs, and others during early 1978 dissuaded him from closing his account or resorting to legal action earlier than he might otherwise have done. But we are unable to say that the delay has been shown to be the result of misstatements or omissions as opposed to persuasion and advice. Accordingly, we conclude that the jury's finding of liability for misrepresentation is without support in the record.

## Damages

■ Like the issues of liability, the issue of damages was poorly tried before the district court. It is the point most weakly presented on appeal. As noted by the district court, Costello's theories of recovery were never made very clear. Essentially, as a result of both the alleged churning and the alleged misrepresentations, he sought to recoup approximately $121,000, which represented roughly an $86,000 decline in the value of his account after the start of the churning [22] and approximately $35,000 paid in commissions during that same period.[23]

19. Plaintiff's Brief, p. 38.

20. We acknowledge that a market valuation of $191,000 on December 30, 1977 is not inconsistent with other valuations.

| 9-7-76 | $235,384.65 | Opening Valuation |
| 7-22-77 | $253,000.00 | Reported by Brownlow |
| 10-31-77 | $234,196.65 | Reported by Brownlow |
| 11-18-77 | $222,710.00 | Reported by Brownlow |
| 7-12-77 | $180,000.00 | Reported by O'Donnell |
| 9-15-78 | $166,780.95 | Closing Evaluation |

If the December 30 report market valuation of $275,906.25 was correct, there must have been a 23% increase in the six weeks preceding and a 34% decrease in six months thereafter. If the data in the record contain facts demonstrating that these changes in market value were improbable, counsel has not favored us with any such analysis.

21. Record, p. 182.

22. The account loss figure was arrived at by plaintiff by subtracting the stipulated closing value of the account ($166,780.95) from what he claimed was the account's pre-churning value in March 1977 ($253,000). We have some question as to whether the latter figure is supported by the record, but our disposition of the damages question makes it unnecessary to explore or resolve that doubt.

23. A letter from Oppenheimer to Costello, designated plaintiff's exhibit 77, indicates that the precise amount of commissions charged during

The damage verdict of $97,000 covered both churning and misrepresentation. Subsequently, the district court concluded that the jury's award was excessive. It reasoned that the evidence would support only $42,500 in churning damages and $11,000 in misrepresentation damages, and so reduced the award to $53,000. The churning figure represented commissions charged during the five months in which the churning took place ($11,500)[24] and the account's decline in market value during that time ($31,000).[25] The misrepresentation figure was the court's calculation of the decrease in the market value of the account between December 30, 1977 and June 1, 1978. Accordingly the court reduced the jury's award to $53,500.

The damage issue has been narrowed in two important respects. First, because we conclude there is insufficient evidence to support the jury's finding of misrepresentation liability, we need not consider misrepresentation damages and thus direct our attention solely to damages recoverable as a result of the churning in Costello's account. Second, because neither party objected to the trial court's instruction to the jury on churning damages, we may accept that instruction as correctly stating the law for purposes of appellate review. "Questions as to the measure of damages may not be considered on appeal where they have not been raised at trial." *McGrath v. Zenith Radio Corp.,* 651 F.2d 458, 470 (7th Cir.

1981). *See also The Prudence Company, Inc. v. Fidelity & Deposit Company of Maryland,* 297 U.S. 198, 207, 56 S.Ct. 387, 389, 80 L.Ed. 581 (1935); *Rouse v. Chicago, Rock Island and Pacific Railroad Co.,* 474 F.2d 1180, 1184 (8th Cir.1973); *V–M Corp. v. Bernard Distributing Co.,* 447 F.2d 864, 867 (7th Cir.1971); *Arkla Exploration Co. v. Boren,* 411 F.2d 879, 883–884 (8th Cir.1969); 5 Am.Jur.2d, *Appeal & Error,* § 640, pp. 94–95. Indeed, neither party now contests the correctness of the instruction.[26] The question before us is whether evidence was introduced that could be used to compute damages under the terms of the instruction and what size of award it supports. *Cf. McGrath, supra,* 651 F.2d at 472–73.

In relevant part, the trial court charged the jury:

If you decide for the plaintiff on the question of liability, then you must fix the amount of money which will reasonably and fairly compensate him. The elements of damage which could have resulted from the wrongful conduct of the defendant are realized losses to the account and commissions on improper transactions.[27]

Turning first to the wrongful commissions element, we conclude there was evidence to support a jury award. The jury found that the improper churning all took place within a five-month span, March through July 1977, so whatever commissions are recovered must be confined to that peri-

March 1977 and subsequent months was $35,033.

We note that defendant argues that permitting recovery of commissions as an element separate from account losses would compensate plaintiff twice for commissions since they in fact were paid out of account funds and thus, are the reason for part of its decrease. Our resolution of the damage question makes it unnecessary to address this contention.

**24.** The district court opinion indicates that its figure for commissions was derived from a memorandum submitted by plaintiff, which in turn was based on a letter from Oppenheimer to Costello, designated plaintiff's exhibit 77. It has been called to our attention that the memo mis-transcribed relevant numbers from the exhibit and that therefore its computations, which were relied on by the district court, are erroneous. An inspection of the original docu-

ment and its reproduction in defendant's appendix at p. 278 clearly indicates that the correct value of the commissions paid during the five-month period is $15,065.92, not $11,461.53, as indicated in plaintiff's memo to the district court.

**25.** The district court saw the best way of approximating damages due to churning as subtracting the market value reported by Brownlow November 18, 1977 ($222,000) from the pre-churning market value claimed by Costello ($253,000). See note 22, *supra.*

**26.** For general discussion of the various measures of damages found appropriate in churning cases, *see Jaffe, supra,* at 323–25; Note, *supra,* 80 Harv.L.Rev. at 883–85, Annot. 32 A.L.R.3d 635, 648–50.

**27.** Record, pp. 620–21.

od. A letter from Oppenheimer to Costello, dated November 3, 1978, and introduced at trial shows that commissions during those months totaled $15,065.92.[28] Presumably some of those commissions were attributable to non-churned trading, but courts have held that the entire amount of commissions paid during a period of excessive activity may be recovered where the defendant, by intentionally disregarding proper standards, has made difficult or impossible the precise measurement of the damages. *See, e.g., Hecht, supra,* 283 F.Supp. at 440, *modified on other grounds,* 430 F.2d 1202. Here, as later noted, the facts would permit identification of the specific churning transactions. Nevertheless Oppenheimer does not now dispute Costello's right to recover all of the commissions paid during the churning period. Reply Brief, p. 9. We hold that the jury could properly have awarded the plaintiff $15,065.92 as commissions on improper transactions.

In contrast to the foregoing, we are unable to find any evidence to support recovery under the instruction's second component of damages, realized losses. Realized loss is a measure of diminished value significantly different from market loss.[29] The distinction between the two is illustrated by a hypothetical offered by defense counsel at oral argument:

"If you have $100 and spend $98 of it for stock and $2 of it for commissions, your stock is worth $98. If the market drops 40 points, you have a market loss of $40, but you do not have a realized loss. Only if you sell at that point do you have a realized loss of $40 on that particular purchase."

In other words, a loss is not "realized" until a sale is made, because until that point it is possible that the security may regain or exceed its original value, thus wiping out the "loss."

The problem with Costello's proof and computations is that he relies on figures which, if anything, establish only market value decreases in the account. As noted earlier, Costello maintains that the total losses resulting from both churning and misrepresentation may be calculated by subtracting the stipulated closing value of the account, approximately $167,000, from what he claims was its pre-churning value in March 1977, about $253,000. His brief on appeal then apportions this total loss between the two violations—$62,000 to churning and $24,000 to misrepresentation—by stating that the account was worth $191,000 on December 30, 1977, and attributing prior decreases into churning and subsequent decreases to misrepresentation.

We are no longer concerned with computation of damages due to misrepresentation, although the comparison of market value appraisals would violate the instruction to determine realized losses.

As previously discussed, the December 30, 1977 figure has no support in the record. Thus as to churning, Costello failed to establish either a resulting loss in market value or realized losses.

The district court similarly confused the concepts of realized loss and market loss. It charged the jury that only realized losses were recoverable, and the record indicates that by this the court intended that there be proof of the "outcome of ... particular transaction[s]...."[30] The court, however, then ignored the terms of its instruction in upholding a portion of the jury verdict. The key figure in its formula for determining "realized losses" was Brownlow's November 18, 1977 valuation of the account.[31] That figure did not denote the "outcome of ... particular transaction[s]," but was a mere statement of the account's market value on that date.[32] The figure, therefore,

---

28. *See* note 24, *supra.*

29. We express no opinion as to whether an instruction allowing recovery of market losses, instead of realized losses, would have been permissible. *But see Fey, supra,* 493 F.2d at 1054–1056 (recovery under market loss instruction reversed and remanded for new trial on other grounds).

30. *See* Record, pp. 544–45.

31. *See* note 25, *supra,* and the accompanying text.

32. *See* Record, p. 308.

cannot serve as the basis for calculating realized losses resulting from the churning.

Likewise, we find the figures in plaintiff's exhibit 77 to be of little help. That letter from Oppenheimer to Costello, dated November 3, 1978, shows the monthly profit or loss incurred by the account during each month it was open. It indicates that over the entire period of September 1976 through August 1977 there was a net realized loss of $17,044.56. In the months prior to the churning (September 1976 through February 1977) there was a net realized profit of $19,446. In the months after the churning began (March 1977 through August 1978) there was a net realized loss of $36,490.

There was a net loss in each of 13 months and a net profit in each of 11. Although there were substantial net losses in three of the months in the churning period and a $56 net loss in July, 1977, there was a substantial net profit in April, 1977. The net loss for the five months in the churning period was $41,239. Plaintiff has not argued that the losses realized in those months would probably represent losses resulting from the churning transactions. We discern no rational basis for deciding that the net loss realized in any particular group of months was proximately caused by the churning transactions.

This court has previously said that "transaction by transaction appraisals in churning cases often will be inconsistent with the unified nature of the offense, or impractical and sometimes unfair," and that a churning defendant "cannot insist upon exact measurements and the precise tracing of causal lines . . . ." *Fey, supra,* 493 F.2d at 1055. Here, however, plaintiff's case differed from the usual. Throughout the litigation it was Costello's position that churning occurred because specific trades violated the parameters established for the account. There was never any serious contention that trading within the guidelines constituted excessive activity. Thus, unlike the usual case in which churning is a unified offense established not on evidence of individual transactions but by proof that an overall course of trading has, in the aggregate, been excessive, *see, id.* at 1054–55, it would have been possible to have identified the wrongful trades and to have traced their financial consequences. Instead, Costello contented himself with placing into evidence, in addition to the market value figures already mentioned, a mass of raw data, consisting largely of the numerous confirmation slips, correction notices, and monthly statements received during the two years his account was with Oppenheimer. Those documents are fairly sophisticated and specialized in nature, using financial terms and notations surely beyond the ken of the average juror as well as ourselves. Presumably, one trained in the subject could sift through this mass of exhibits and determine whether there is evidence that particular transactions violated the guidelines and resulted in realized losses. However, no such expert testimony, nor even any helpful summary of the exhibits, was introduced. We find it highly unrealistic to think that the jury—assuming it could first deduce which transactions violated the account parameters—successfully fought its way through this mass of data and arrived at an informed decision on the question of realized losses.

Accordingly, we must conclude, albeit reluctantly, that Costello has failed to identify support in the record for any recovery under the realized losses component of the churning damages instruction. He has shown support for an award of $15,062.92, the amount equal to commissions paid during the churning period. Thus both the unapportioned jury award and the reduced amount approved by the district court are excessive.

The judgment appealed from is reduced to $15,062.92. Within 20 days after return of our mandate, plaintiff may elect the vacation of the judgment and a new trial on the issue of churning and damages therefrom. If he does not so elect, the judgment shall stand affirmed as herein reduced. No costs on appeal are allowed to either party.