**The EVANSTON BANK, Plaintiff,**

v.

**CONTICOMMODITY SERVICES, INC., and Ted Thomas, Defendants.**

**No. 83 C 2980.**

United States District Court, N.D. Illinois, E.D.

Dec. 10, 1985.

---

Ray G. Rezner, Gerald M. Miller, W. Scott Porterfield, Fishman, Merrick & Perlman, P.C., Chicago, Ill., for plaintiff.

Geraldine M. Alexis, William J. Nissen, Thomas K. Cauley, Sidley & Austin, Chicago, Ill., for defendant ContiCommodity Services, Inc.

James R. Streicker, Cotsirilos & Crowley, Chicago, Ill., for defendant Ted Thomas.

## MEMORANDUM AND ORDER

MORAN, District Judge.

In late May of 1982 the board of directors of the Evanston Bank discovered that the bank had lost over $1,200,000 in about one year of trading in commodities, while paying over $270,000 in commissions. The bank now brings this action for com-

modities fraud against ContiCommodity Services, Inc. (Conti), the futures commission merchant through which it traded in commodity futures, and Ted Thomas, the broker who handled its account.[1]

The bank's version of how the loss occurred appears in the six counts of its complaint. Counts I and II allege violations of the Commodity Exchange Act (CEA), 7 U.S.C. § 1 *et seq.*, specifically that Conti and Thomas used the bank's account for unauthorized trading and "churned" it (traded it excessively) to generate unnecessary commissions. The bank maintains that it intended only to hedge in commodities as a protection against rising interest rates, a conservative investment strategy. It says that it got speculative trading instead. Since Conti and Thomas used the mails and the telephone in connection with the trading, count IV alleges mail and wire fraud in violation of 18 U.S.C. § 1961 *et seq.*, the Racketeer Influenced and Corrupt Organization Act (RICO). The remaining counts are pendent claims under Illinois law. Count III, for common law fraudulent misrepresentation and concealment, and count V, for fraudulent or deceptive business practices under Ill.Rev.Stat. ch. 121½ ¶ 262, rest on Thomas' alleged assurances that the bank's account would be traded in accordance with appropriate banking regulations and Federal Deposit Insurance Corporation (FDIC) policies, and that the bank would be charged commissions at the same rate as other banks. Since an FDIC policy statement in effect then and now allows hedging in commodities but strongly discourages banks from speculative trading, and the bank was charged $94 per "round turn" (per transaction) while other Conti customers with similar account activity were charged $30 to $35 (and apparently some banks with other firms had a rate of only $11 to $20), the bank claims fraud and deception. Finally,

---

1. A "futures commission merchant" is the term for the business dealing in commodities transactions for customers which, if it dealt in securities, would be called a "brokerage house." The natural persons dealing with customers are properly called "agents" and/or "associated per-

sons." However, the similarities to the securities business are so great that cases typically refer to commodities "brokerage houses" and "brokers." 1 P. Johnson, Commodities Regulation 101 (1982); *see, e.g., United States v. Dial,* 757 F.2d 163 (7th Cir.1985).

count VI, apparently in the alternative, alleges negligence in the handling of the bank's account.

Conti, however, presents a different version of how the loss occurred and moves for summary judgment in its favor. The board of directors of the bank fully authorized Richard Christiansen, at that time both the chairman of the bank's board of directors and the bank's chief executive officer, to handle commodities trading for the bank. Conti maintains that all of the trades followed Christiansen's instructions on the bank's objectives and the overwhelming majority of them were either specifically approved or later ratified by him. Christiansen also executed a power of attorney to Thomas to make trades on behalf of the bank. The bank may now regret its choice of Christiansen as its agent (he was fired in June 1982, after the rest of the board discovered the extent of his trading), but nevertheless it chose him and so must bear the loss from his acts. And, if any further authority is needed, Conti points out that it strictly complied with the bank's instructions to send daily written confirmation of each trade to the cashier of the bank, Hindrek Ott. Neither Ott nor any other representative of the bank disavowed any trade until May 28, 1982. Since the bank was fully informed, both through its agent Christiansen and through the notice to the cashier, Conti argues, its silence ratified the trades. Therefore, Conti is not liable for the bank's losses as a matter of law. Defendant Thomas has moved to adopt Conti's motion.

This court finds to the contrary that, at least on the evidence now before us, this case needs a trial to resolve a host of unanswered questions. The primary purpose of summary judgment is to avoid the expenditure of time and money on a trial in cases where a trial would serve no real function. *Mintz v. Mathers Fund, Inc.*, 463 F.2d 495 (7th Cir.1972). Summary judgment should not be granted when facts or the inferences to be derived from facts are in dispute, because finding facts and drawing inferences are tasks for a trier of fact. *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Wang v. Lake Maxinhall Estates, Inc.*, 531 F.2d 832 (7th Cir.1976). Some inquiries by their very nature are fact-intensive. Fraud, for example, involves questions of intent and knowledge, which are normally questions for a trier of fact. If a reasonable person could draw more than one inference from the known facts, summary judgment is not appropriate. *Rock Island Bank v. Aetna Casualty and Surety Co.*, 706 F.2d 219 (7th Cir.1983). Agency questions also tend to be fact intensive. A third party dealing with an agent has a legal obligation to verify both the fact and the extent of the agent's authority. *Malcak v. Westchester Park District*, 754 F.2d 239, 245 (7th Cir.1985). The inquiry will usually focus on whether reliance on the indications of authority which were present was reasonable under all the facts and circumstances. Such questions of reasonableness also in most cases must go to triers of fact. *See e.g., Borg-Warner Leasing v. Doyle Electric Co.*, 733 F.2d 833, 836 (11th Cir. 1984); *Moreau v. James River-Otis, Inc.*, 767 F.2d 6, 9 (1st Cir.1985). This case involves both allegations of fraud and questions of agency. It cannot be cut off at this point.

## I. FACTS

The complexity of the case requires that the facts be set out in considerable detail. In March 1981 Conti conducted a seminar on commodities trading especially tailored for financial institutions. Thomas, then head of Conti's broker training program and soon to be an account executive in Conti's Chicago office, participated. Christiansen, accompanied by Michael McGreal, the Evanston Bank's president, attended the seminar. Neither had any previous experience in trading commodities but Christiansen, who had read an article on the subject, wanted the bank to consider trading futures contracts in order to hedge

the bank's assets against interest rate fluctuations.[2]

Thomas contacted Christiansen and McGreal soon after the seminar. There is some dispute as to the exact characterization Thomas gave of himself at that point in his effort to win the bank's business. McGreal says that Thomas held himself out as a specialist in hedging for financial institutions. Thomas maintains that he represented himself merely as "knowledgeable" and "attempting to specialize." His knowledge came from one seminar on banks and commodities trading held the year before, and Thomas now admits that he was not familiar with the language of specific regulations and FDIC policy statements. During the next year the Evanston Bank was in fact his only bank client, although he had previously handled the account of one other bank. What Thomas felt he understood at that time was that banks could not open speculative accounts but could have hedge and arbitrage accounts.[3] An FDIC policy statement of November 20, 1979, permits banks to hedge on financial futures to protect against interest rate fluctuations, but describes other transactions "such as taking futures positions to speculate on future interest rate movements" as "inappropriate futures transactions for banks." 44 Fed.Reg. 66673; *amended at* 45 Fed.Reg. 18116 (March 20, 1980) *and at* 46 Fed.Reg. 51302 (Oct. 19, 1981). Under 12 U.S.C. § 1818, conduct contrary to FDIC policy can result eventually in a bank's losing its insured status with the FDIC, which in turn would mean loss of federal insurance protection for its depositors and loss of membership in the Federal Reserve System.

The bank opened a commodity futures hedge account with Conti on May 19, 1981. The board had endorsed a corporate authorization, a standard form furnished by Conti. By its terms, the bank authorized Christiansen and McGreal to buy and sell commodities for the bank, with written confirmations to go to the cashier, Ott, "who is hereby authorized to receive and acquiesce in the correctness of such confirmations, statements and other records and documents." Christiansen then completed a standard customer's agreement and a risk disclosure statement, a new account worksheet and a hedging account designation form. According to the latter, "Any and all positions in the above-mentioned account will be bona fide hedges as defined in Regulation 1.3(2) of the Commodity Futures Trading Commission (CFTC)." McGreal asserts, and Thomas apparently does not deny, that at the time the account

---

**2.** "Hedging," in commodities trading parlance, means about what a layman familiar with the phrase, "to hedge one's bets," would think it means. The function of the "hedge" on the commodities market is to protect against loss in a separate commercial transaction in which the customer already has a commitment. For example, a lumber merchant with a large inventory of plywood is "long" on plywood. If the price of plywood goes down he will lose money. He therefore acquires futures contracts to sell plywood ("short" contracts). If the price of plywood sinks, the profit he makes on the futures contracts will largely offset his lost profits on the plywood he already holds. If the price of plywood rises, the loss he suffers on the futures contracts will largely offset the profit he makes selling from his inventory. (Conversely, a contractor obligated to build with plywood who has very little on hand is "short" on plywood, and would hedge by acquiring "long" contracts, contracts to buy plywood. If the price of the plywood he needs goes up, the profits from the futures contracts will compensate for the extra outlay; if plywood goes down, the loss from the futures will balance the money he saves on plywood.) Hedging normally protects against serious loss at a sacrifice of windfall profit. *See generally Johnson, supra* n. 1 at 36–45; *Dial, supra* n. 1, 757 F.2d at 164–65.

**3.** "Speculating," in commodities parlance, is any pattern of investment that is not hedging, *i.e.,* any investment made for appreciation in value, however modest. It includes both "straight" speculation and the "spread" or "straddle." In "straight" speculation, one acquires contracts just on one side of the market, either "long" or "short." For a "straddle," the customer acquires obligations in the same commodity on both sides of the market, but with slightly different delivery periods. "Arbitrage" is a species of "straddle," in which the acquisitions on one side of the market are made with one contract market (Board of Trade, Commodities Exchange), and those on the other side are made with a different contract market. A "straddle" is less risky than a "straight" pattern, but is still properly speculation. *Johnson, supra* n. 1, at 36, 46–50.

was opened Thomas said that the bank's account would be traded in such a fashion that there would be no problem with any relevant regulations for banks, including FDIC policies, and that Evanston Bank would be charged the same commissions that other banks trading through Conti were charged. McGreal and Christiansen told Thomas at that time that the bank's investment objective was to hedge the bank's assets against rising interest rates—a very conservative strategy of acquiring futures contracts to sell ("shorts") corresponding to assets held by the bank—and that the bank would "rather be safe than sorry."[4] The first activity in the account was on June 2, 1981.

From July 1981 through December 1981 all parties agree that trading in the bank's account was consistent with those objectives. It averaged 22.8 transactions per month and was profitable. Thomas left Chicago to become branch manager of Conti's Houston office at the beginning of August, but continued to handle the Evanston Bank's account. A few days before he left, on July 27, Christiansen executed a document in the bank's name which gave Thomas a power of attorney over the bank's account. The origin of this document is disputed. Thomas maintains that it came in response to a concern voiced by Christiansen and McGreal that Thomas would be unable to reach them by telephone at a crucial time. McGreal disavows such a concern, and both deposition testimony and board minutes show that the board was unaware of any such document's existence throughout the period of the bank's trading. Christiansen's deposition testimony is silent on this and all other disputed matters since he relied upon his privilege against self-incrimination to decline to answer virtually all questions. The document made the bank's account a "discretionary account," a status not encouraged by Conti's own policy manual. According to Thomas, he used his authority for a few trades over the life of the account, but most came as a result of frequent telephone conversations with Christiansen.

The pattern of trading began to shift in January of 1982. In that month the bank's activity included 150 contracts in day trades, more day trades than had been placed during the entire life of the account up to that time.[5] Approximately that volume of trading persisted through February. Then in March activity took another quantum jump, with 326 contracts day-traded. From January until the board halted all trading at the end of May, the monthly average was 297.8 trades, over ten times the average for the previous six months. Although Thomas declines to call this trading "speculative," he agrees that it was a change in position in the futures market seeking higher yield. The bank's net "open positions" in its account with Conti shifted from an overall short position in January to $27,000,000 long at the end of April. According to Irving Hankin, an expert witness whose affidavit was submitted by the bank, this trading pattern was speculative and quite inconsistent with the bank's origi-

---

**4.** In addition to the better known futures in agricultural commodities such as corn and pork bellies, the commodities markets regularly sell futures contracts for a wide variety of both tangibles and intangibles, including financial instruments. The bank's account was traded overwhelmingly in futures contracts for United States Treasury bonds, though occasionally a transaction for another instrument, such as a Treasury bill or a Government National Mortgage Association certificate, would appear. A pattern of hedging would involve acquiring futures contracts to sell assets corresponding to assets the bank already held. If, for example, the bank held Treasury bonds at 8% interest,

and the interest rate on new Treasury bonds went to 12%, the selling price of the bank's bonds would go down. To protect against that loss, the bank, being "long" in Treasury bonds, would hedge by acquiring "short" contracts—future contracts to sell Treasury bonds. *See Johnson, supra* n. 1, at 38, 44.

**5.** A "day trade" is the entering and liquidating of a futures position on the same day. Virtually by its nature it is a speculative trade because of the commission expense. A day trader is known also as a "scalper." *Johnson, supra* n. 1, at 53.

nal objectives.[6] Since commissions were charged per transaction, this pattern also generated substantial commissions for Conti and Thomas, for example a larger charge for commissions in the month of March alone than for all trading in the account in 1981. The account's increased activity brought no reduction in the rate which the bank paid. By Thomas' admission, large volume customers normally were charged lower commission rates. Hankin found the commissions "atypically large."

According to Thomas, the shift in trading resulted from Christiansen's instructions to change the bank's investment strategy. Though he is not clear on the precise date, at some point in early 1982 Christiansen approached him with the question of whether it was feasible to make day trades for profit; told that it was, he authorized Thomas to make such day trades. Thomas says that Christiansen informed him that the bank needed to generate profits in order to meet a major debt which was coming due. Indeed, the bank's holding company, Evco, faced a quarterly payment on a $1,350,000 loan. It had intended to meet the payment with bank stock dividends, but, in March, the Commissioner of Banks denied permission to issue a dividend because the bank had not been sufficiently profitable. All bank personnel, however, deny that the board ever looked to commodities trading to generate the amount due, or in any other way changed its investment strategy for commodities. If Christiansen indeed ordered such a change, he seems to have concealed it from the board. He also apparently lied to the bank's asset and liability committee about the size and nature of the bank's trading. The loan to Evco was secured by bank stock and Christiansen's personal guarantee.

Another apparent effort to infuse cash into Evco came in late April and May. Christiansen also was the bank's chief loan officer. The bank loaned $50,000 to Thomas, who then used the funds to purchase Evco stock. The loan was issued to Thomas' Illinois bank account, though he had then lived in Houston for several months. The 800 shares of Evco stock were actually paid for by and issued to Thomas' wife in her maiden name, which she had not used for business for over 20 years. Thomas says that these arrangements were Christiansen's idea, "to avoid unnecessary questions from the bank examiners."

In any case, daily reports of the increased trading went to Ott, the cashier. Ott testified by deposition that his only responsibilities towards these reports on Christiansen's instructions, were to "book the entries," to post the gains and losses on the bank's general ledger, and then to put the statements into a file. The Evanston Bank did not have a regular cashier's report. The board reviewed only the monthly statements, not the daily ones. By opening and closing a position on the same day, the trading pattern eliminated the need for margin calls on the bank.[7] Thomas admits that the motive for some trades was to avoid margin calls. The directors did not actually know the bank's true position until late May. When they did, the board first

**6.** By definition, *any* net "long" position for the bank, no matter how small, was speculative. Hedging is a process of acquiring futures contracts which tend to offset investments one already has. *See* fns. 2 and 4, *supra.* Since the bank was in effect already "long" by virtue of its investments, it could only hedge by acquiring "short" contracts. A net "long" position would therefore be a speculation that interest rates would rise. *See* fn. 3, *supra.* A position $27,000,000 long, then, is a $27,000,000 speculation.

**7.** A customer's "margin" in a commodities transaction is not the same thing as a "margin" in securities. Since the futures contract involves a promise to perform in future, both those who promise to buy and those who promise to sell are required to deposit a sum of money in the nature of a performance bond or earnest money, to ensure that they will perform. This sum is a "margin." Customers who only "hedge" usually are allowed lower margin amounts since the danger of default is less. A loss is considered to erode this bond and therefore is usually followed by a "margin call" for additional funds to be placed on deposit. (Conversely, the customer may withdraw amounts equivalent to the profit made on a transaction from his "margin.") *Johnson, supra,* n. 1, at 31–34. A margin call is therefore associated with both speculation and loss.

ordered Christiansen to stop trading on May 28 and then began liquidating as rapidly as it could without absorbing so much of a loss as to make it insolvent. Christiansen was terminated by June 15. Conti fired Thomas in September, by his testimony for matters not related to the Evanston Bank account.

## II. THE TRADING IN LIGHT OF FEDERAL AND STATE LAW

Conti's and Thomas' assertions in support of their motion for summary judgment fall broadly into two categories which this discussion will analyze separately. First, they maintain that regardless of the role of Christiansen or any ratification, their conduct did not rise to a level which would make them legally liable for commodities fraud. This section will analyze that argument. Secondly, even if they would otherwise be liable, the bank authorized all Conti's and Thomas' acts either through the power of attorney, through Christiansen, or through ratification by the bank's silence after notice. Section III will explore the agency problems. Both sections, however, deal with the same ultimate question: whether judgment can be granted now as a matter of law or must await a trier of fact.

### A. Commodities Fraud and RICO

#### 1. Liability under the CEA

Count I seeks to impose liability on Thomas for unauthorized trading and on Conti both directly and vicariously for its employee's acts. Conti's direct liability would result from its alleged aiding and abetting of Thomas, its failure to supervise its broker with procedures which would have brought his conduct to light, and its failure to investigate the investment objectives and financial resources of its client the bank to make sure its investments were suitable, as required by trade regulations. Conti argues, however, that it cannot be directly liable since even if proved true, none of those allegations states a claim under the Commodities Exchange Act as applied to losses incurred in 1982.

The CEA provides for enforcement of its provisions largely through the administrative agency it created, the CFTC. The express private right of action under the CEA, 7 U.S.C. § 25, was enacted by Congress only in the Futures Trading Act of 1982, P.L. 97–444 § 235, 96 Stat. 2322 (1982). It was not in effect during the period of the bank's losses. The Supreme Court has held that the general provision against commodities fraud, 7 U.S.C. § 6b, includes an implied private right of action for both acts expressly prohibited by that provision and acts prohibited by some regulations promulgated under it. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). However, courts which have dealt with the question have found significant limits on that implied right of action. In *Curran*, the court reasoned that since Congress amended the CEA in 1974 aware that courts were finding private rights under it, and did nothing to correct that impression, it must have implicitly adopted the law as it found it into the CEA. 456 U.S. at 378–82, 387, 102 S.Ct. at 1839–41, 1843. In interpreting *Curran*, then, lower courts have concluded that the implied private right delineated by that decision is limited to those actions which the law recognized in 1974. Any action based on a theory of recovery not recognized in 1974—which includes most breaches of CFTC regulations—must be independently analyzed under the familiar tests of *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), and *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *See J.E. Hoetger & Co. v. Asencio*, 558 F.Supp. 1361 (E.D. Mich.1983). So, courts have failed to find any pre-1982 right of action based on aiding and abetting, *Johnson v. Chilcott*, 590 F.Supp. 204 (D.Colo.1984), failure to supervise, *Bennett v. E.F. Hutton Co.*, 597 F.Supp. 1547 (N.D.Ohio 1984), or failure to find investments suitable to the customer, *Asencio*, 558 F.Supp. at 1364. *Cf. Cardoza v. CFTC*, 768 F.2d 1542 (7th Cir.1985). This court concludes that the bank has no

action against Conti for a breach of any of these.

■ It does not follow, however, that Conti could not be found liable. The CEA makes brokerage firms vicariously liable for the CEA violations of their agents, whether authorized or not, as long as the agent was "acting for" the firm at the time. 7 U.S.C. § 4; *Poplar Grove Planting and Refining Co. v. Bache Halsey Stuart, Inc.*, 465 F.Supp. 585 (M.D.La.), *remanded on other grounds* 600 F.2d 1189 (5th Cir.1979). The Supreme Court in *Curran* specifically held that the implied right of action under the CEA includes actions for fraud, deceit or misrepresentation. 7 U.S.C. § 6b; *Curran*, 456 U.S. at 389–90, 102 S.Ct. at 1844–45. If Thomas were found liable for commodities fraud, Conti would also be liable.

The § 6b action, however, requires intentional or reckless conduct similar to the *scienter* element of common law fraud. Since the term "willfully" occurs four times in § 6b, and since its function roughly parallels that of the antifraud provision of the Securities Exchange Act, 15 U.S.C. § 78j(b), which has already been construed to cover only intentional misrepresentation, most courts construing the CEA have found that liability for commodities fraud must be based on more than negligence. *See McIlroy v. Dittmer*, 732 F.2d 98 (8th Cir.1984); *CFTC v. Savage*, 611 F.2d 270 (9th Cir.1979). While the broker or house need not have had a demonstrably evil motive or an affirmative intent to injure customers—a fiduciary's breach of duty in appropriate circumstances is constructive fraud—nevertheless most courts, before finding a § 6b violation, look for at least knowing and deliberate conduct. *See Marchese v. Shearson Hayden Stone, Inc.*, 734 F.2d 414 (9th Cir.1984); *Silverman v. CFTC*, 549 F.2d 28, 31 (7th Cir.1977); *Haltmier v. CFTC*, 554 F.2d 556 (2d Cir.1977). The standard for private actions in both the Ninth and the First Circuits is intentional or willful conduct, including acting with knowledge of a false statement or an omission, or acting with reckless disregard of

the falsity or omission. *Yopp v. Siegel Trading Co., Inc.*, 770 F.2d 1461, 1464 (9th Cir.1985); *First Commodity Corp. of Boston v. CFTC*, 676 F.2d 1, 6 (1st Cir.1982). Recklessness has been defined in this context as conduct which "departs so far from the standards of ordinary care that it is very difficult to believe that the speaker was not aware of what he was doing." *First Commodity*, 676 F.2d at 7. Such a standard closely parallels the standard in the Seventh Circuit for securities fraud actions, *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977), and so would probably be adopted here for commodities fraud as well. *See Crook v. Shearson Loeb Rhoades, Inc.*, 591 F.Supp. 40 (N.D.Ind. 1983). *But see Gordon v. Shearson Hayden Stone, Inc.*, Comm.Fut.L.Rep. (CCH) ¶ 21,016 (CFTC 1980) (CFTC uses negligence standard).

### 2. Unauthorized Trading

■ A genuine issue of fact exists as to whether Thomas' conduct in trading the bank's account could be characterized as intentional or reckless. Thomas, as the bank's broker, owed it a fiduciary duty, and that is a factor in the analysis. *Marchese*, 734 F.2d at 418; *Crook*, 591 F.Supp. at 48. A breach of a broker's fiduciary duty is not in every instance also a § 6b violation, *Hagstrom v. Breutman*, 572 F.Supp. 692, 697 (N.D.Ill.1983), but when the breach appears intentional or reckless, and seems to benefit the broker at the expense of the client, as in the case at bar, it usually is grounds for a § 6b recovery. *Crook*, 591 F.Supp. at 48. For example, ignoring a client's express trading instructions is conduct so far from the ordinary standard of care that it must be either intentional or reckless. When a broker promised his customer that he would trade a discretionary account in a particular manner, and then repeatedly failed to do so, the conduct was both a breach of fiduciary duty and a violation of the CEA. *McIlroy*, 732 F.2d at 103–04. It is undisputed that Thomas initially promised to hedge the Evanston

Bank account. Despite Thomas' reluctance to characterize the 1982 trades as speculative, there can be no genuine issue that they were. For the bank, any net long position was speculative and its account was $27,000,000 long. Unless a trier of fact found that Christiansen's agency, or a ratification theory, worked to release Thomas from that promise, it could infer unauthorized trading from these facts.

■ Also, a conscious decision not to disclose an objectively obvious danger to a client is reckless non-disclosure, which for a fiduciary amounts to misrepresentation or deceit. *Sundstrand*, 533 F.2d at 1047–1048. A trier of fact could infer that Thomas knew that the trades he made after January 1982 presented an obvious danger to the bank, given the FDIC policy with which he was at least somewhat familiar, and consciously decided not to inform his principal of that danger. If the agency issues were resolved against Conti, then a trial could find that Thomas breached his duty through unauthorized trading and reckless nondisclosure, and Conti would be liable as well.

### 3. "Churning"

■ A similar analysis holds for count II. Churning has been defined as excessive trading in an account over which the broker has control for the primary purpose of generating commissions. *Yopp*, 770 F.2d at 1465. Churning is a particular species of unauthorized trading which provides a separate and additional claim when high commission charges stem from an amount of trading that exceeds what is appropriate for the client's investment goals. Such trading, of course, breaches a broker's fiduciary duty. *Id.* Churning was part of the "contemporary legal context" in 1974 and is therefore included in the implied right of action for fraud, misrepresentation or deceit under § 6b. *Curran*, 456 U.S. at 381, 389, 102 S.Ct. at 1840, 1844. *See, e.g., Hagstrom*, 572 F.Supp. at 698; *Booth v. Peavey Co. Commodity Services*, 430 F.2d 132 (8th Cir.1970); *Johnson v. Arthur Espey, Shearson, Hammill &*

*Co.*, 341 F.Supp. 764 (S.D.N.Y.1972). The elements of an action for churning a commodities account are the same as in securities transactions. While there is no single test or formula, generally a plaintiff must show (1) broker control of the account, and (2) excessive trading of the account which was (3) intentional or willful, *i.e.*, for the purpose of generating unnecessary commissions or at least with reckless disregard for the client's interest. *See Yopp*, 770 F.2d at 1466, applying *Mihara v. Dean Witter & Co.*, 619 F.2d 814 (9th Cir.1980); *Costello v. Oppenheimer & Co.*, 711 F.2d 1361, 1368 (7th Cir.1983); *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983). Usually the intent or recklessness will be implicit in the nature of the conduct. *Armstrong*, 699 F.2d at 91.

The facts before the court, at the very least, could raise an inference of churning. Since the account was discretionary, Thomas presumptively had control. *Cf. Yopp*, 770 F.2d at 1466; *Costello*, 711 F.2d at 1368. The amount of trading in 1982 massively exceeded that of 1981. It generated commissions described by plaintiff's expert as "atypically high," charged at a rate which Thomas admits was significantly higher than that which other customers with similar activity levels paid. Liability then would turn on whether the trading was consistent with the client's objectives. *Compare Costello*, 711 F.2d at 1368 *with Fey v. Walston & Co.*, 493 F.2d 1036, 1045, 1048 (7th Cir.1974). That question is a question of fact. In this case it can only be answered after a resolution of the same agency questions that apparently control count I: whether a change in the bank's objectives was authorized, either by Christiansen or through a ratification by silence. As in count I, if these questions were resolved against Conti and Thomas, they could be liable.

### 4. RICO

■ The bank also seeks triple damages from Conti through civil RICO. The provisions of this statute have been interpreted to cover a range of conduct substantially

wider than the popular conception of "racketeering." RICO unquestionably reaches many types of "garden variety fraud," including some commodities fraud. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. ——, ——, 105 S.Ct. 3275, 3283, 3287, 87 L.Ed.2d 346 (1985). Under 18 U.S.C. § 1964(c), a plaintiff may recover treble damages for an injury to his business or property which results from a violation of 18 U.S.C. § 1962. One violates § 1962 by conduct of an enterprise through a pattern of racketeering activity. Racketeering activity, defined in 18 U.S.C. § 1961(1), includes mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. By the terms of 18 U.S.C. § 1961(5), at least two acts of such racketeering activity must fall within a ten-year period. These individual acts are usually called the "predicate offenses." *Sedima*, 105 S.Ct. at 3285; *Haroco, Inc. v. American National Bank and Trust Co. of Chicago*, 747 F.2d 384, 386 (7th Cir.1984), *aff'd* 473 U.S. ——, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). The conduct must also comprise a "pattern." 18 U.S.C. § 1962(c).

■■■ The question is whether civil RICO will stretch to cover these commodities offenses. At a minimum, the predicate offenses must exist before RICO liability is triggered. *Sedima*, 105 S.Ct. at 3281; *Haroco*, 747 F.2d at 397–398. To support an offense of mail fraud, a mailing must have been "in furtherance of the scheme," meaning the mailing must have been at least "incidental to an essential part of the scheme." *United States v. Wormick*, 709 F.2d 454, 462 (7th Cir.1983); *see also United States v. Murphy*, 768 F.2d 1518, 1530 (7th Cir.1985). Mailings which conflict with the purposes of the scheme do not meet this test. *Wormick*, 709 F.2d at 462; *United States v. Staszcuk*, 502 F.2d 875, 880 (7th Cir.1974). The bank attempts, in its complaint, to use the daily confirmation statements, monthly statements, margin notices and general correspondence sent to the cashier as mailings in furtherance of the scheme. No one suggests that these materials were themselves fraudulent or even inaccurate. Whatever one finds as to the impact of these mailings for a possible ratification argument, this court thinks that regular, accurate and truthful reports of transactions cannot further a scheme to defraud. Indeed, they would appear to conflict with its purposes. There is therefore no evidence that the mails were used to further any scheme.

■■■ The bank also alleges wire fraud. Under the law of this circuit, use of the telephone constitutes wire fraud if that use is for "the purpose of executing" a scheme to defraud, *Sutliff, Inc. v. Donovan Companies*, 727 F.2d 648, 653 (7th Cir.1984), or at least "in furtherance of the scheme," *United States v. Freeman*, 524 F.2d 337, 339 (7th Cir.1975). The bank alleges that Thomas used the telephone to make various misrepresentations to Christiansen, and made non-disclosures by way of the telephone.

■■■ This allegation provides the needed predicate offenses. A fiduciary's misrepresentations or non-disclosures would be fraudulent. *See United States v. Dial*, 757 F.2d 163, 168 (7th Cir.1985); *United States v. Feldman*, 711 F.2d 758, 763 (7th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983). Thomas, of course, denies any misrepresentations or non-disclosures on the telephone or anywhere else, and that testimony is unrebutted. But he admits to using the telephone to discuss transactions, and he admits that the motive behind some day trades was to avoid margin calls. The bank specifically argues that such use of day trades was concealment. By avoiding margin calls, these trades avoided events which would have disclosed the true nature and size of the bank's position to the board. And indeed, if a trier of fact found, for example, a scheme to churn the account, it could reasonably find that the use of day trades was a concealment which furthered the scheme. Two telephone calls about day trades within ten years would then satisfy the requirement of predicate offenses.

The racketeering activity which causes injury must also flow from a "pattern" of such activity. Since the only RICO provi-

sion which gives any content to the term "pattern," § 1961(5), is the same one which speaks of two acts of racketeering activity within ten years, some courts have held that two telephone calls or two mailings meet this "pattern" requirement even when they support only one episode of fraud. *See, e.g., United States v. Starnes*, 644 F.2d 673 (7th Cir.1981); *Sedima*, 105 S.Ct. at 3293, 3295 (Marshall, J., dissenting). The Supreme Court in *Sedima*, however, expressly noted that the courts have failed to develop a meaningful concept of "pattern." 105 S.Ct. at 3287. An alternative view, supported by both the ordinary meaning of the word "pattern" and a close reading of *Sedima*, is that it takes at least two fraudulent schemes or episodes, related by common purposes, methods or results, to make up a "pattern of racketeering activity." *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.*, 615 F.Supp. 828 (N.D.Ill. 1985); *see Sedima*, 105 S.Ct. at 3285 n. 14. Under this approach, a firm would not find itself vicariously liable for triple damages merely because one of its agents engaged in his own fraud. *Inryco*, 615 F.Supp. at 828. If, however, similar schemes appeared within different branches of the same enterprise, a trier of fact could reasonably conclude that the firm itself engaged in a pattern of racketeering activity.

Here the existence of a "pattern" is an issue under either view. If one episode of fraud suffices, then two uses of the telephone in support of a scheme to churn the account are a "pattern." The bank's complaint, however, also refers to accusations of CEA violations against Conti by several participants in its sugar arbitrage program. These complaints have arisen in this district and in other areas of the United States, in accounts handled by different brokers, and have led to several lawsuits, *e.g., Walbert v. ContiCommodity Services, Inc.*, No. 84 C 10455 (N.D.Ill.) If a "pattern" requires at least two episodes of racketeering activity, two schemes of commodities fraud may be sufficiently related to establish a pattern. Unless the trading was authorized, then, the RICO count also survives summary judgment.

## B. Fraud and Deceptive Practices under Illinois Law

### 1. Fraudulent Misrepresentation

■ The bank also makes three claims under Illinois law, beginning with count III for fraudulent misrepresentation and concealment. When the account was opened, Thomas assured the bank of commission charges equivalent to those of Conti's other financial institution customers. The account designation itself stated in writing that all trades would be hedges, and Thomas promised they would be well within banking regulations. The bank asserts that he then not only speculated, but concealed the speculation by using day trades which avoided margin calls. These, it argues, amount to fraud.

Common law fraud is an action with potential pitfalls at every step. In general, the plaintiff can recover for fraud in Illinois when he is damaged through acting in justifiable reliance on a false statement of material fact which the defendant made, knowing or believing it to be false and intending to induce plaintiff to act. *Soules v. General Motors Corp.*, 79 Ill.2d 282, 402 N.E.2d 599, 37 Ill.Dec. 597 (1980). Courts often break that rule down into a numerical list of elements of fraud, but the lists differ, and there is case law construing nearly every word whether it is a separate element on the list or not. *See generally Mother Earth, Ltd. v. Strawberry Camel, Ltd.*, 72 Ill.App.3d 37, 390 N.E.2d 393, 28 Ill.Dec. 226 (1st Dist.1979). Actually, "there is no general rule for determining what facts will constitute fraud. Rather, its existence depends upon the particular facts of each case." *Carey Electric Contracting, Inc. v. First National Bank of Elgin*, 74 Ill.App.3d 233, 236, 392 N.E.2d 759, 762, 30 Ill.Dec. 104, 107 (2d Dist.1979).

### a. Difficulties: future promises and justifiable reliance

The pitfalls on the particular facts of this case come especially in the areas of falsity, knowledge of falsity and reliance. Certain-

ly statements were made. The allegation of concealment also fits, since the concept of "statement" includes silence if accompanied by deceptive conduct or suppression of material facts. *Grane v. Grane,* 130 Ill. App.3d 332, 344, 473 N.E.2d 1366, 1374, 85 Ill.Dec. 561, 569 (2d Dist.1985). The statements also were material. A representation is material if the plaintiff would have acted differently if he had known the truth instead of relying on the representation. *Chapman v. Hosek,* 131 Ill.App.3d 180, 186, 475 N.E.2d 593, 598, 86 Ill.Dec. 379, 384 (1st Dist.1985). This court has no difficulty believing that the bank would have acted differently if it had been told that Conti would charge it three times the rate other major customers paid, or if Thomas had announced an intention to speculate that could run the bank afoul of FDIC policy. One may also presume from the circumstances that Thomas intended to induce an act from the bank, namely, placing its commodities business with Conti. *Cf. Chicago Title & Trust Co. v. First Arlington National Bank,* 118 Ill.App.3d 401, 410, 454 N.E.2d 723, 730, 73 Ill.Dec. 626, 633 (1st Dist.1983). The bank also acted to its damage. It traded commodities through Conti, and continued to trade through them for a year, suffering substantial losses and paying over $200,000 in commissions.

The problems begin with whether Thomas' promises legally amount to false statements of fact; and whether he knew they were false when he made them. It is not enough for a statement to turn out to be false. The statement must have been false when made, and its maker must have known or believed that it was false. Yet no one knows the future. When a statement refers to events in the future, it can be opinion rather than fact, or mere prophecy that failed rather than a false promise. Thus the general rule in Illinois, as Conti and Thomas point out, is to deny recovery for fraud when a defendant's promise merely related to his conduct in the future. *Steinberg v. Chicago Medical School,* 69 Ill.2d 320, 371 N.E.2d 634, 13 Ill.Dec. 699 (1977). Conti and Thomas argue that this

case falls within that rule. The assurance on commission rates was just an opinion of value. The promise to hedge concerned future conduct which is not actionable.

Further questions arise as to whether the bank's reliance on Thomas' promises was justifiable. Merely showing that a plaintiff relied on a representation does not suffice. That reliance must also have been reasonable under the circumstances. Persons are generally presumed to know what they might have learned with ordinary prudence. *Central States Joint Board, Industrial Workers Local # 8 v. Continental Assurance Co.,* 117 Ill.App.3d 600, 453 N.E.2d 932, 73 Ill.Dec. 107 (1st Dist.1983). For example, a trier of fact might find that a bank should have inquired to check competitors' rates. Or, it might find that an ordinarily prudent bank board would itself have read the FDIC policies rather than relying on a broker to do so. *Cf. Central States,* 117 Ill.App.3d at 606, 453 N.E.2d at 937, 73 Ill.Dec. at 112. And in some circumstances no one is entitled to rely. For example, in Illinois one cannot rely on another's representation of law since both parties are considered equally capable of finding and interpreting law. *City of Aurora v. Green,* 126 Ill.App.3d 684, 467 N.E.2d 610, 81 Ill.Dec. 739 (2d Dist.1984). Although the FDIC policy statement does not have the force of law, it might be analogized to law as something which the bank could find and interpret as well as Thomas could.

### b. Future promises by one who claims special knowledge

But the bank's fraud claim, while problematic, cannot be shunted aside quite that easily. The Illinois rule on future promises has a significant exception. When a promise or representation relating to future conduct is alleged to be the scheme employed to accomplish the fraud, it is actionable. *Steinberg,* 69 Ill.2d at 334, 371 N.E.2d at 641, 13 Ill.Dec. at 706. As the Illinois Appellate Court pointed out in *Vance Pearson, Inc. v. Alexander,* 86 Ill.App.3d 1105, 1112, 408 N.E.2d 782, 787, 42 Ill.Dec. 204,

209 (4th Dist.1980), since misrepresentations are ordinarily the schemes by which the victim is defrauded, the exception tends to swallow up much of the general rule. In that case the defendant had promised to complete a project by a specific date when in fact he could not and had no intention of doing so. The promise was an actionable misrepresentation. It was part of the inducement by which he got the plaintiff's business, and so was itself part of the scheme. In the case at bar, a trier of fact could find a scheme to get the bank's business in order to generate commissions. Assertions about commission rates and trading practices would then be part of the scheme. *See also Perlman v. Time, Inc.,* 64 Ill.App.3d 190, 380 N.E.2d 1040, 20 Ill. Dec. 831 (1st Dist.1978).

The claim is also strengthened at several points by the allowances the law makes for differences in the level of knowledge between one party and another. For example, when an assertion concerns a matter peculiarly within the knowledge of the party making it, Illinois law will usually consider it a statement of fact, not merely an opinion of value. *Time,* 64 Ill.App.3d at 196, 380 N.E.2d at 1046, 20 Ill.Dec. at 837. In that case, a publisher's assertion that a subscriber to a cancelled magazine would get "full value" for the remainder of his subscription by exchanging it for an unspecified number of issues of another magazine was held a statement of fact. Whether the commissions the bank paid were in line with what Conti charged similarly situated customers was likewise a matter within Conti's knowledge, and was therefore a statement of fact.

The same principle applies to the issue of knowledge of falsity. The statement about commissions seems false on its face, since other customers paid far less. But the bank might have difficulty showing that Thomas actually knew it was false when he made it. Perhaps he did not know the rates his firm charged other customers. But affirming what a speaker does not know to be true, on a subject where he supposedly has special knowledge, has the same legal effect as knowledge of falsity.

*Duhl v. Nash Realty, Inc.,* 102 Ill.App.3d 483, 491, 429 N.E.2d 1267, 1274, 57 Ill.Dec. 904, 911 (1st Dist.1981).

Nor does the impact of a knowledge differential stop there. Ordinarily, when a claim is based on a promise of future conduct, to show knowledge of falsity a plaintiff must prove that the party had no intention of performing when he made the promise. *Pearson,* 86 Ill.App.3d at 1109, 408 N.E.2d at 785, 42 Ill.Dec. at 207. The promise about commission rates presents no problem there, since the bank immediately began paying $94 per round turn. The assurance that the trading would be well within banking regulations is a different matter. The parties agree that at least for the first six months the account was hedged. However, in appropriate circumstances a party who claims special knowledge may be required to "predict the future" in his specialty. In *Duhl,* a plaintiff who had purchased a new house but could not sell his old one had an action against the realtor who had made representations about how quickly the former home would sell and for how much. The court held that knowledge of falsity was satisfied. When a speaker claims special knowledge and then affirms what he does not know to be true, he should bear the loss for one who relies on the affirmation. 102 Ill.App.3d at 491, 429 N.E.2d at 1274, 57 Ill.Dec. at 911. Though Thomas denies calling himself a specialist, he admits to the assertion "knowledgeable." He promised to trade within regulations and policies. He thus affirmed what he did not know, since he had not read the regulations and policies. As a broker he had more control over how the bank's account would be traded than the realtor in *Duhl* had over how rapidly a house would sell. *Cf. Mother Earth,* 72 Ill.App.3d at 51, 390 N.E.2d at 405, 28 Ill.Dec. at 238. He could be found liable on his promise. The bank's claim is not blocked by the Illinois rule for future promises.

**c. Justifiable reliance on one who claims special knowledge**

As a general proposition, a plaintiff's negligence is not a defense to an intention-

al tort. In an action for fraud, that principle means that, as a general rule, a plaintiff who was merely negligent in failing to ferret out the truth will still recover if he can show falsity and knowledge of falsity. *Chapman*, 131 Ill.App.3d at 187–88, 475 N.E.2d at 599, 86 Ill.Dec. at 379; *Mother Earth*, 72 Ill.App.3d at 52, 390 N.E.2d at 405, 28 Ill.Dec. at 238. The rule extends to cases of investment fraud. *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522 (7th Cir.1985). To give effect to this rule, the requirement of justifiable reliance is softened when certain factors are present which make reliance under the circumstances merely negligent. The presence of a defendant who has asserted special knowledge is one such factor.

Ordinarily a plaintiff may rely on a representation when the defendant has superior knowledge of the subject. *Glazewski v. Allstate Insurance Co.*, 126 Ill.App.3d 401, 466 N.E.2d 1151, 81 Ill.Dec. 349 (1st Dist. 1984). Unquestionably that principle applies to a representation about commission rates. Under the circumstances here, it could also apply even to one on FDIC policies. In *Kinsey v. Scott*, 124 Ill.App.3d 329, 463 N.E.2d 1359, 79 Ill.Dec. 584 (2d Dist.1984), the plaintiff sued on a representation that an apartment house conformed to the building code when it did not. While she could be charged with knowledge of the code, she had little experience in real estate and could not have applied the code to the building. Thus she could not have discovered the non-conformity by ordinary prudence. *Cf. Chapman*, 131 Ill.App.3d at 187, 475 N.E.2d at 599, 86 Ill.Dec. at 385 (home's flooding problem not easily discoverable). Whether reliance is reasonable is a heavily factual inquiry, and it includes consideration of the plaintiff's particular qualities and characteristics. *Chicago Title*, 118 Ill.App.3d at 409, 454 N.E.2d at 729, 73 Ill.Dec. at 632. The bank's representatives were inexperienced in commodities. A trier of fact could find that they reasonably decided that Thomas could better apply the relevant policies to their trading, or at most were only negligent in relying on him.

Reliance after limited inquiry may also be justifiable if a defendant's actions have lulled the plaintiff into a false sense of security. *Mother Earth*, 72 Ill.App.3d at 52, 390 N.E.2d at 405, 28 Ill.Dec. at 238; *Carter v. Mueller*, 120 Ill.App.3d 314, 457 N.E.2d 1335, 75 Ill.Dec. 776 (1st Dist.1983). The six months of restrained profitable trading before 1982 could have created the feeling that the bank could rely on Thomas. The experience could only have heightened the impression that he was indeed an expert. And as the *Duhl* court said, "One should not be allowed to hold oneself out as an expert whose statements or advice is to be relied upon and then, after someone else has relied on that advice to his detriment, say, 'You should not have believed me.'" 102 Ill.App.3d at 492, 429 N.E.2d at 1274, 57 Ill.Dec. at 904. Only a trier of fact can weigh the evidence and draw the appropriate inferences. The bank has at least raised a question of fraud.

### 2. Deceptive Business Practices

If issues remain on the fraudulent misrepresentation count, then they remain on count V for deceptive business practices under Ill.Rev.Stat. ch. 121½, ¶ 262. The bank has standing to sue under the statute. The statute protects persons and a "person" is defined expressly to include corporations. Ill.Rev.Stat. ch. 121½, ¶ 261(c); *cf. McDonald's Corp. v. Gunvill*, 441 F.Supp. 71 (N.D.Ill.1977), *aff'd* 622 F.2d 592 (7th Cir.1980). A contract for investment services and commodities futures is deemed a contract for the purchase of merchandise under Ill.Rev.Stat. ch. 121½, ¶ 261(b), so the statute covers deceptive practices in soliciting an investment in commodities futures. *Heinold Commodities, Inc. v. McCarty*, 513 F.Supp. 311, 313 (N.D.Ill. 1979).

The statutory action provides plaintiffs with even broader protection than common law fraud. *Kellerman v. Mar-Rue Realty and Builders, Inc.*, 132 Ill.App.3d 300, 476 N.E.2d 1259, 87 Ill.Dec. 267 (1st Dist.1985). In particular, liability is not limited to representations about existing material facts,

so future or contingent events are less of a problem. And the speaker's intent is not an issue since one can recover even for a negligent misrepresentation. *Duhl*, 102 Ill. App.3d at 495, 429 N.E.2d at 1277, 57 Ill. Dec. at 914; *Beard v. Gress*, 90 Ill.App.3d 622, 413 N.E.2d 448, 46 Ill.Dec. 8 (4th Dist. 1980). Also, reliance is easier to justify since the statute places no burden of investigation on a plaintiff. *Grimes v. Adlesperger*, 67 Ill.App.3d 582, 384 N.E.2d 537, 23 Ill.Dec. 743 (4th Dist.1978). Therefore, the same evidence which enables a fraud count to survive a summary judgment motion will easily keep the statutory claim alive as well.

If Thomas' conduct were found fraudulent, Conti would be liable. In Illinois an employer is liable for torts, including the intentional torts, of his employee, when the plaintiff's injury stems from an act within the scope of his employment and actuated at least in part by a purpose of furthering the employer's interest. *Gregor v. Kleiser*, 111 Ill.App.3d 333, 443 N.E.2d 1162, 67 Ill.Dec. 38 (2d Dist.1982); *Sunseri v. Puccia*, 97 Ill.App.3d 488, 422 N.E.2d 925, 52 Ill.Dec. 716 (1st Dist.1981). Thomas was employed to trade commodities and generated commissions for Conti with his trading. Also, one who puts an agent in a position from which he can commit a fraud, while apparently acting within his authority, is generally subject to liability for the fraud. *National Acceptance Co. v. Coal Producers Ass'n*, 604 F.2d 540, 543 (7th Cir.1979). In short, the defendants have failed to demonstrate that, exclusive of agency issues at least, they cannot be found liable for fraud or deceptive practices as a matter of law.

### 3. Negligence

Similarly, facts which survive a motion for summary judgment at a level of intentional conduct will survive on a count that alleges negligence. Pleading in the alternative, the bank's count VI alleges, for example, that Thomas and Conti negligently allowed speculative trades in a hedge account, failed to follow their own procedures in reviewing the account, and allowed investment advice to be given to a financial institution by a broker with limited knowledge and experience. Unless the trading was authorized, the facts present an issue as to whether they met the standard of care which brokers may reasonably be expected to exercise toward their customers.

### III. RESPONSIBILITY FOR THE TRADING IN LIGHT OF AGENCY LAW

Conti and Thomas can therefore avoid a trial only if they can show that the bank authorized Thomas' trading of the account. Their arguments here fall broadly into two legal categories. First, they assert that Thomas had express actual authority to trade the account as he did, from the power of attorney he held and the instructions he received from the bank's authorized agent for trading, Christiansen. Additionally, they argue that Thomas had implied authority for the trades, since the bank's failure to repudiate any transactions effected a ratification by estoppel.

To find that the bank authorized Thomas' acts, his authority must be legally traceable, directly or indirectly, to the bank's board of directors. The authority of an agent, whether express or implied, must stem from the words or actions of his principal. *Chase v. Consolidated Foods Corp.*, 744 F.2d 566 (7th Cir.1984). The principal in question here is not a natural person, but a corporation—the bank. The board of directors of a corporation functions more or less as its collective legal guardian, and formal actions of the board are the actions of the corporation. Since a corporation can act only through its agents, some individual agents will have authority to act for the corporation in a variety of situations. But their authority is only effective insofar as it can be traced back to a board of directors' action (or, in a few cases not relevant here, to the action of stockholders): either through an express grant of authority from the board, or impliedly, for example through the board's hav-

ing placed the individual in a corporate office or position which carries the inherent authority to act for the corporation in certain transactions.[8] *See generally Chase,* 744 F.2d at 568-69; 2 Fletcher, *Cyclopedia of the Law of Private Corporations,* §§ 434, 444, 483.1 (1982). If the authority is based on ratification, again that ratification must be traceable ultimately to the board of directors, either because the board expressly adopted a transaction, or because it knew or should have known all the material facts and behaved in a way that implied ratification. *Harris Trust & Savings Bank v. Joanna-Western Mills Co.,* 53 Ill.App.3d 542, 368 N.E.2d 629, 11 Ill.Dec. 78 (1st Dist.1977); 2A Fletcher, *Cyclopedia,* §§ 752, 756 (1982).

### A. Express Authority

#### 1. Thomas' Power of Attorney

■ With these basic principles in mind, our analysis turns first to the evidence for express actual authority. Thomas held a power of attorney ostensibly executed on behalf of the bank, which made the account discretionary. However, that document was signed by Christiansen alone and the board denies all knowledge of it. For purposes of summary judgment, then, it can function as a binding grant of authority from the bank only if Christiansen indisputably already held authority from the board to give Thomas such power. For Christiansen to have such authority, it would have to stem either from the board's express grant of authority to him for commodities transactions, or from his inherent authority as chief executive officer of the bank.

**8.** "Inherent authority" is a term adopted from 1 Restatement of the Law of Agency 2d, §§ 8A, 161(b) (1958). It is used for the authority which arises when a principal designates an agent of a kind who ordinarily possesses certain powers. For example, a corporate president would be expected to have a range of inherent authority which more or less "goes with the office." *See, e.g., Lind v. Schenley Industries, Inc.,* 278 F.2d 79, 85 (3d Cir.1960). Illinois case law usually places this type of authority under the umbrella label of apparent authority, since the agent appears to a third party to have the authority

■ Neither line is without dispute. If the ostensible source was Christiansen's own power to buy and sell, then the power of attorney is presumptively void as a matter of law. As a general rule an agent can delegate to someone else the ministerial tasks which his principal has assigned to him, but not those which require the exercise of judgment or discretion. 1 *Restatement of the Law of Agency 2d,* §§ 18, 78 (1958). The rule is less strictly applied when the principal is a corporation. But, nevertheless, a corporate officer normally "has no authority to delegate special powers conferred on him, and which involve the exercise of judgment or discretion, unless he is expressly authorized to do so, or unless the circumstances are such that the authority is necessarily implied." 2 Fletcher, *Cyclopedia,* § 503. *Cf. Ohio Boulevard Land Corp. v. Greggory,* 46 F.2d 263 (6th Cir.1931); *Insurance Co. of North America v. Wisconsin Central Railway,* 134 F. 794 (7th Cir.1905). Since buying and selling commodities involves the exercise of judgment and discretion, and the bank selected Christiansen and McGreal to do it, the law presumes that neither of them has the authority to delegate that trust to another. Conti offers no proof to the contrary.

■ Neither is it clear that Christiansen, as the bank's chief executive officer, had the inherent authority to execute such a power of attorney on behalf of the bank. Unquestionably, the president or chief executive officer of a corporation has very broad powers to bind the corporation by virtue of the office he holds. However, those powers extend only to transactions within the usual and ordinary business of

which similarly situated agents customarily possess. *See, e.g., Corn Belt Bank v. Lincoln Savings and Loan Ass'n,* 119 Ill.App.3d 238, 456 N.E.2d 150, 74 Ill.Dec. 648 (4th Dist.1983). But it could just as well be considered a species of implied authority. When a principal gives an agent tasks to perform, the law will imply the authority reasonably necessary to carry them out. *See* the discussion in *Lind,* 278 F.2d at 84–85. Since the term "inherent authority" avoids this problem and has more precision than either "apparent" or "implied," it is used here.

the corporation. *Harris,* 53 Ill.App.3d at 550–51, 368 N.E.2d at 635–36, 11 Ill.Dec. at 84–85. Persons doing business with a corporation are entitled to assume that a chief executive is authorized to act for it, as long as the transaction falls within ordinary bounds. Those seeking unusual or extraordinary arrangements, however, are not entitled to simply rely on the officer's own assertions of authority.

The question of what is unusual or extraordinary is normally one for the trier of fact, since it depends on the facts and circumstances of the business, the officer's position and the specific transaction. *Corn Belt Bank v. Lincoln Savings and Loan Ass'n,* 119 Ill.App.3d 238, 456 N.E.2d 150, 74 Ill.Dec. 648 (4th Dist.1983). For example, in *Sacks v. Helene Curtis Industries, Inc.,* 340 Ill.App. 76, 91 N.E.2d 127 (1st Dist.1950), a corporate president had inherent authority to hire, but not to give a percentage of profits as compensation. Similarly, in *Melish v. Vogel,* 35 Ill.App.3d 125, 343 N.E.2d 17 (1st Dist.1975), the president had inherent authority to retain an attorney, but not for fifteen years. Both decisions found that a board would not normally allow a single officer to commit that great a proportion of corporate assets to another, without at least consulting the board. Here the power of attorney involved entrusting ultimately a far greater proportion of the bank's assets to Thomas. A trier of fact could reasonably infer that the grant was extraordinary and beyond Christiansen's inherent power. With Christiansen's authority to issue the power of attorney in dispute, it cannot serve as a basis for finding that Conti and Thomas are not liable as a matter of law.

### 2. Christiansen's Express Authority

■ Thomas, however, also maintains that Christiansen personally either authorized or ratified all the trades. Christiansen's silence of course does not refute the claim. Ordinarily, proof of Christiansen's approval would settle the issue. The board had expressly authorized Christiansen to buy and sell commodities. Third parties can normally rely on express grants of authority. However, if a third party knows or has reason to know that the agent with whom he is dealing is in fact exceeding his authority, the right to rely is extinguished. *Chase,* 744 F.2d at 569. For example, a third party who knows that an agent is faithless and engaged in a fraud on his principal, cannot join in the fraud and then claim innocent reliance on the agent's authority. *Fustok v. Conticommodity Services, Inc.,* 577 F.Supp. 852 (S.D.N.Y.1984), *complaint dismissed on other grounds,* 610 F.Supp. 986 (S.D.N.Y. 1985); Restatement, § 166 and comment a.

A trier of fact could reasonably infer that Thomas knew, or should have been on notice, that Christiansen was exceeding his authority from the bank. Even an agent with an express grant of authority has no authority to act contrary to the known wishes and instructions of his principal. *Old Security Life Insurance Co. v. Continental Illinois National Bank,* 740 F.2d 1384, 1391 (7th Cir.1984). For example, when the agent's acts or assertions conflict with the reasonable inferences that can be drawn from a corporate resolution, a third party may be found on notice of limits to that agent's authority. *Old Security,* 740 F.2d at 1391. Here the bank had authorized Christiansen and McGreal to trade, but Christiansen alone purported to grant discretionary power over the bank's account to Thomas. The contradiction might have spurred a prudent person to make further inquiry.

Further contradiction arose when Christiansen instructed Thomas to make day trades for speculation. The last communication Thomas had from Christiansen's principal, the bank, indicated that the bank wanted only to hedge and to trade within regulations. The new trading was speculative and ran afoul of an FDIC policy statement. Defendants point out that there was nothing illegal about the bank's trading. Designation of an account for hedging does not mean that only hedges may be traded from it, *Montgomery & Associates, Inc. v. Thomson, McKinnon Securities, Inc.,* Comm.Fut.L.Rep. (CCH) ¶ 22,368 (CFTC

1984), and FDIC policy statements do not have the force of law. However, the argument misses the point. To paraphrase a recent Illinois appellate decision, the mere fact that the bank had the power to make speculative trades does not of itself clothe even the highest officer of the bank with the authority to bind the bank to such trades. *Corn Belt*, 119 Ill.App.3d at 245, 456 N.E.2d at 156, 74 Ill.Dec. at 654. In that case a creditor bank sued a savings and loan association on an agreement guarantying promissory notes executed by debtors. The chief executive officer of the savings and loan, who also had express authority from his board to borrow funds from the creditor bank, made the guaranty of the promissory notes ostensibly on behalf of the savings and loan. The savings and loan argued that it had no power to make guaranties. The court found that it did. However, savings and loans rarely issue guaranties. The extraordinary nature of the transaction was therefore a matter to be considered in determining whether the officer had authority to make it. 119 Ill.App.3d at 244, 456 N.E.2d at 155, 74 Ill.Dec. at 653. Similarly, the question here is not whether the bank could make speculative trades but rather whether Christiansen's instructions to make them, given the existence of the bank's earlier instructions and the FDIC statement, should not have seemed so extraordinary to Thomas as to make him question whether Christiansen was still acting in his principal's interest. In Illinois, whether a person has notice of limits on an agent's authority, or is put on notice by circumstances, is generally a question of fact. *Corn Belt*, 119 Ill.App.3d at 245, 456 N.E.2d at 156, 74 Ill.Dec. at 654; *Schoenberger v. Chicago Transit Authority*, 84 Ill.App.3d 1132, 1138, 405 N.E.2d 1076, 1081, 39 Ill.Dec. 941, 946 (1st Dist.1980).

The problems are compounded by the indications from which Thomas could have inferred that Christiansen was acting for his own benefit rather than for the bank. If a person knows that an agent is acting for himself, the transaction is suspicious on its face and the principal is not bound unless the agent is in fact expressly authorized to make it. Where circumstances indicate that the agent may be acting in fraud of the principal, the person must exercise care and investigate or the principal will not be liable. Whether or not the person has reason to know of the agent's improper motive is a question of fact. *See Fustok*, 577 F.Supp. at 858; Restatement, § 165 comment c, § 166 comment c. If Thomas knew that Christiansen had personally secured the $1,350,000 loan to Evco, he would know that Christiansen had a personal motive for his actions. It would not be unreasonable for a trier of fact to infer from the very strange series of transactions where the bank, through Christiansen, loaned Thomas money and his wife then bought Evco stock in her maiden name, that at least by then Thomas knew something.

Thomas was the bank's broker, owing it a fiduciary duty. The question is whether at some point that duty, plus reasonable prudence under the circumstances, did not require him to contact McGreal or some officer other than Christiansen to see if the bank's objectives truly had changed. A trier of fact might even infer from his failure to inquire that Thomas followed Christiansen's instructions, in spite of the warning signs, because Thomas benefited from the large commissions which the speculative trading generated. *Cf. Fustok*, 577 F.Supp. at 857. The evidence supporting express actual authority from the bank for a change in trading comes in a factual context which makes it equally open to an interpretation that the trading was unauthorized. In such a situation summary judgment cannot be granted.

**B. Implied Authority (Ratification)**

Defendants' second line of argument looks to implied authority. Even if an agent's act exceeds his authority, it can bind his principal if the principal later ratifies it. Ratification may be express, or it may be implied from a failure to repudiate the unauthorized transaction. Restatement, §§ 82, 94. The latter variety is often called "ratification by estoppel" because

the failure to repudiate can mislead a third party into concluding that the transaction was authorized, and so the principal should be estopped to deny his agent's authority. *See Harris,* 53 Ill.App.3d at 552, 368 N.E.2d at 636, 11 Ill.Dec. at 85. A series of ratifications, express or implied, of similar transactions will give implied actual authority to an agent to make such transactions in the future, even though they are beyond his express authority. Restatement, § 43. In the case at bar Thomas and Conti had been trading in a speculative pattern for five months, with Christiansen fully informed, and with daily notices of the transaction sent to the cashier according to the bank's instructions. Neither Thomas nor Conti received any hint of repudiation during that time. They therefore argue that the bank's silence ratified the trades and at some point gave Thomas the right to assume that he was authorized to trade the same way in the future.

■ Illinois case law, however, indicates that determining whether ratification has occurred is a complex, fact-intensive inquiry. Ratification from silence, or "ratification by estoppel," will be found only when a principal, with full knowledge of all material facts, conducts himself in a manner inconsistent with repudiation of his agent's transaction, and a third party relies on that conduct to his detriment. Each of these elements, knowledge, conduct and reliance, is a question of fact to be answered in light of the surrounding circumstances. *Harris,* 53 Ill.App.3d at 549–53, 368 N.E.2d at 635–37, 11 Ill.Dec. at 84–86.

The inquiry is fact-intensive because of the policy considerations on which the legal principles are based. The purpose of the doctrine of ratification by estoppel is to protect innocent third parties, not parties who share responsibility for the loss. Where the conduct of the party claiming the ratification has contributed to the injury, courts are reluctant to find ratification. *Old Security,* 740 F.2d at 1392; *cf.* Restatement, § 101(a). That is especially true when, as here, the party is also himself the agent who allegedly exceeded his authority

in the very transaction to which he now seeks to bind his principal through ratification. Every aspect of such a transaction must be carefully scrutinized to ensure that he is not simply trying to make his principal bear the loss for his own wrongdoing. *Cf. Corn Belt,* 119 Ill.App.3d at 251, 456 N.E.2d at 160, 74 Ill.Dec. at 658; Restatement, § 101(b).

### 1. Knowledge

■ Giving these facts such scrutiny reveals problems in each of the elements. For example, ratification may be inferred from silence only when the principal has full knowledge of all material facts. *Harris,* 53 Ill.App.3d at 549–50, 368 N.E.2d at 635, 11 Ill.Dec. at 84; Restatement, § 91. Since the principal here is a corporation, the only knowledge it had was that knowledge which is imputed to it by law from its agents. An agent's knowledge is generally imputed to his principal if it is received while he is acting within the scope of his agency and concerns a matter within the scope of his authority. *Campen v. Executive House Hotel, Inc.,* 105 Ill. App.3d 576, 434 N.E.2d 511, 61 Ill.Dec. 358 (1st Dist.1982). The rationale for the rule is that a third party may reasonably rely on an agent's fiduciary duty to convey important information to his principal. If for any reason that duty does not exist toward a particular item of knowledge, then the rule does not apply. Restatement, § 275. For that reason, when the principal is a corporation, whether the agent's knowledge will be imputed is a question of fact which takes into account the nature of the information, the circumstances in which the agent received it, and the agent's position in the corporate hierarchy. *Continental Oil Co. v. Bonanza Corp.,* 706 F.2d 1365, 1377 n. 16 (5th Cir.1983); *cf.* 3 Fletcher, *Cyclopedia,* § 807 (1975, and 1985 cum. supp.).

Considering all of those factors, only a trier of fact can determine whether the daily statements sent to the bank's cashier legally represent knowledge which can be imputed to the bank. The party seeking to

establish a ratification must show that the knowledge which he seeks to impute concerns a matter within the scope of the agent's authority. In a claim involving services rendered for a fishing trawler, the fact that agents of the vessel's owner knew that it was tied up at the fleeting company's dock did not establish knowledge chargeable to the owner without proof that they had authority from him to contract for services to the vessel. *Bull v. Mitchell*, 114 Ill.App.3d 177, 448 N.E.2d 1016, 70 Ill.Dec. 138 (3d Dist.1983).

Further, for knowledge to be imputed, the agent must have not just a duty in relation to the subject matter, but a duty to speak to his principal about the specific item of knowledge. Restatement, § 275 comment c. So, for example, in a suit over an oil and gas lease, a corporation had employed a title examiner who had read the lease. It was not charged with knowledge of the lease's unusual provisions on drilling requirements since nothing indicated that the title examiner had any duty to determine or report about drilling requirements. *Sawyer v. Mid-Continent Petroleum Corp.*, 236 F.2d 518 (10th Cir.1956). Similarly, in an action for loss of cargo from a lighter which sank while alongside a pier, the harbormaster's knowledge that the lighter was moored at the pier was not imputed to the connecting ocean carrier because he had no duty to report the lighter's presence. *General Motors Corp. v. Pennsylvania Railroad*, 357 F.Supp. 646, 653 (S.D.N.Y.1973), *aff'd* 506 F.2d 1395 (2d Cir.1974). The cashier, Ott, describes his duties toward the entries as ones of recording the data on them in corporate books. Conti and Thomas have not shown that he had a duty to analyze them and report his analysis to his superiors. Such a duty does not necessarily follow from the nature of his position.

In addition, a principal is only bound by the knowledge which would appear to be important to the agent, in view of his duties and prior knowledge. The principal is not affected by information which, when acquired, reasonably seems irrelevant or insignificant to that agent. Restatement, § 275 comment d. For example, in a suit for trademark infringement, Great Plains Bag argued that Georgia-Pacific was estopped from objecting to its GP mark. Since the mark had been in use for several years corporate employees must have seen it, and Georgia-Pacific had not objected. The court found that one issue was what type of employees had seen the mark. If a professional salesperson who could recognize the significance of the mark's relation to his company's own mark had seen it, his knowledge would be imputed to the corporation. However, "knowledge of mark usage gained by bookkeepers in receiving checks ... should not normally be imputed to the corporation. Their duties are not of the type that would require sensitivity of the value of their employer's marks in the marketplace." *Georgia-Pacific Corp. v. Great Plains Bag Co.*, 614 F.2d 757, 763 (C.C.P.A.1980). Confirmation notices for commodities trades, like those for securities, are not necessarily readily analyzed by the average person. *Cf. Costello*, 711 F.2d at 1364; *Hecht v. Harris, Upham & Co.*, 430 F.2d 1202, 1209 (9th Cir.1970). In the case at bar it is not clear whether the cashier's duties were routine, like a bookkeeper's, or whether he should have recognized the significance of the information on the statements. Only a trier of fact, therefore, can decide whether his knowledge should be imputed to the bank.

Nor is there any other route by which knowledge of the speculative trading can be imputed to the bank as a matter of law. At the summary judgment stage one needs uncontroverted proof that the board of directors had or should be charged with knowledge to find ratification by silence. *Harris*, 53 Ill.App.3d at 549, 368 N.E.2d at 635, 11 Ill.Dec. at 84. Knowledge of matters in the corporate files and records is generally imputed to directors, and the cashier did enter data from the statements into the corporate books. However, the principle is an equitable one, and such knowledge is only imputed after a reason-

able time. In the leading Illinois case, knowledge was imputed after it had been in the records for a year and a half, while here the earliest entries had been booked less than six months previously. *Cf. Roth v. Ahrensfeld*, 373 Ill. 550, 27 N.E.2d 445 (1940).

▉ The information was of course within the scope of both Thomas' and Christiansen's agencies, and both had a duty to speak. However, knowledge is normally not imputed when an agent is acting adversely to the principal and for his own or another's benefit. Since the agent then has a motive for concealing the information, one can no longer assume that he will fulfill his duty to speak. *McKey & Poague, Inc. v. Stackler*, 63 Ill.App.3d 142, 152, 379 N.E.2d 1198, 1205, 20 Ill.Dec. 130, 137 (1st Dist.1978); Restatement, § 282(1). Any allegation of fraud against the agent, for example, removes the presumption that the knowledge will be imputed and triggers a factual inquiry. *Metropolitan Sanitary District v. Anthony Pontarelli & Sons, Inc.*, 7 Ill.App.3d 829, 288 N.E.2d 905 (1st Dist.1972).

In *Pontarelli*, a case with a number of similarities to the instant one, the Sanitary District sued a contractor and its own chief engineer for fraud. The contractor admitted that there were flaws in the sewer it had constructed, but claimed that the plaintiff had acquiesced in the work. The chief engineer had approved the work at various stages and other engineers from the Sanitary District were on the construction site. Some evidence existed which could have indicated that the contractor and the chief engineer joined together to defraud the District. On the other hand, there was evidence of poor subsoil conditions and faulty design. The court found that the circumstances raised issues of material fact and denied the contractor's motion for summary judgment. The allegations of fraud against the chief engineer meant that his knowledge could not be imputed to the District. The other engineers were under no duty to report to the District, only the chief engineer was. Therefore, their knowledge could not necessarily be imputed to the District either. The court decided that only a trial could sort out the problems. *Pontarelli*, 7 Ill.App.3d at 840–41, 288 N.E.2d at 912–13.

Such reluctance to impute relates directly to the policy concern behind ratification, namely its protection of those who have innocently relied on silence. Ratification will normally not apply where the party asserting it has knowledge of or convenient access to facts contrary to those on which he purportedly relied. *In the Matter of Pubs, Inc. of Champaign*, 618 F.2d 432, 438 (7th Cir.1980). For example, in *Perlman v. First National Bank of Chicago*, 15 Ill.App.3d 784, 305 N.E.2d 236 (1st Dist. 1973), debtors sued their lending bank for calculating annual interest on their loans by using a year of 360 days. The bank attempted to argue that the debtors were estopped by their acquiescence to the practice. The court commented that it would be "a strange twist of the law that would permit the party with knowledge of the facts to estop the party without knowledge." 15 Ill.App.3d at 797, 305 N.E.2d at 246. As the preceding discussion of express authority shows, Thomas and Christiansen both had motives which could have conflicted with their duty to speak. A trier of fact could infer that they did engage in some concealment. There seems little doubt that Thomas' actual knowledge of the transactions far exceeded the actual knowledge of the board. Under those circumstances, finding a ratification at the summary judgment stage would be inappropriate on the knowledge issue alone.

**2. Conduct**

▉ Ratification also can only be found when the principal's conduct is inconsistent with repudiation of the transaction. Silence is not itself necessarily ratification as a matter of law. Rather, it is evidence from which a trier of fact may draw an inference that the principal intended to affirm his agent's act. *Shearson Hayden Stone, Inc. v. Leach*, 583 F.2d 367, 369 (7th Cir.1978); Restatement, § 94 comment a.

The failure to object must be considered in the context of all the facts and circumstances in which it occurred. "Ratification will not be implied ... from acts or conduct which are as consistent with an intention not to ratify as to ratify." *Arthur Rubloff & Co. v. Drovers National Bank*, 80 Ill. App.3d 867, 872, 400 N.E.2d 614, 618, 36 Ill.Dec. 194, 198 (1st Dist.1980). A delay of a few months is not necessarily to be interpreted as a failure to object, *Shoenberger*, 84 Ill.App.3d at 1139, 405 N.E.2d at 1082, 39 Ill.Dec. at 947, and a failure to object is not necessarily to be interpreted as indicating intent to ratify, when other reasons could explain the principal's actions. *Drovers*, 80 Ill.App.3d at 873, 400 N.E.2d at 619, 36 Ill.Dec. at 199. Here the bank could have failed to object, for example, because it did not know there was anything to object to. And if its agents were engaged in concealment, a delayed response would be reasonable. Only a trier of fact can make the appropriate inference.

### 3. Reliance

Also, one who claims a ratification must show not only that the principal failed to object, but that he was actually misled by that silence into doing that which he would not have done except for the silence. *Pubs*, 618 F.2d at 438; *First National*, 15 Ill.App.3d at 795, 305 N.E.2d at 245. In *Harris*, the estate of a key employee claimed that he had refrained from selling his stock in reliance on what he thought was an agreement that the corporation would repurchase it at his death. The court found that if he knew that his agreement needed to be disclosed and approved, he could not have been misled by any corporate failure to repudiate it and so could not have relied on the corporate silence to his detriment. 53 Ill.App.3d at 553, 368 N.E.2d at 637, 11 Ill.Dec. at 86. Similarly, the owner of a registered landmark, who failed to disclose its landmark status when applying for a demolition permit but rather took advantage of confusion over addresses to get a permit, could not estop the city from collecting damages for the demolition. He had not been misled by the city's failure to object but, rather, had contributed to that failure with his own deceit. *City of Chicago v. Roppolo*, 113 Ill.App.3d 602, 447 N.E.2d 870, 69 Ill.Dec. 435 (1st Dist. 1983). A trier of fact could infer that Thomas had decided to make speculative trades in any event and merely avoided any act which would bring the trades forcefully to the bank's attention. He would then not have been misled by the silence and in fact would have contributed to it. On those facts no ratification could be found.

### 4. Negligence Rather Than Ratification

Also, the gist of the action here is intentional misrepresentation. As noted above, II–B, in the discussion of fraud, ordinarily an action for intentional fraud cannot be defeated by an assertion that the person defrauded was negligent in failing to discover the truth. This circuit, like others, has carried that principle over into actions for securities fraud. A plaintiff's ordinary negligence, or lack of due diligence, is no bar to recovery for securities fraud, although gross negligence might be. *Angelos*, 762 F.2d at 528–29; *Sundstrand*, 553 F.2d at 1048. Given the many similarities between securities and commodities claims, this court sees no reason why the same principle should not extend to commodities fraud. In *Hecht*, an action for churning of a securities account, the plaintiff recovered in spite of having received accurate confirmation slips and monthly statements for seven years. The court found that she simply could not discern from the statements whether the trading was excessive. 430 F.2d at 1209. A trier of fact could easily conclude that the bank's failure to recognize excessive trading from the statements it received for not quite six months was no more than ordinary negligence, and still find for the bank.

The end of this long trail is therefore that the arguments on express authority and ratification, like the previous arguments about level of conduct, do not provide grounds for granting summary judgment. Conti and Thomas may or may not

be liable for commodities fraud. Only a trial can tell for sure.

### CONCLUSION

Paragraph 17 of plaintiff's count I is stricken. Defendant ContiCommodity Services' motion for summary judgment is in all other respects denied. Defendant Thomas' motion to adopt the motion for summary judgment is granted, but the motion thus adopted is denied.